### 𝕾𝖙𝖆𝖚𝖓𝖙𝖔𝖓.

## CITY OF ROANOKE V. ELLIOTT AND OTHERS AND MANIHAN AND OTHERS V. ELLIOTT AND OTHERS.

September 19, 1918.

1. STATUTES—*Constitutionality—Emergency Clause.*—Section 53 of the Constitution of 1902 forbids putting statutes other than appropriation bills into immediate operation, "unless in case of emergency (which emergency shall be expressed in the body of the bill)." It is, therefore, necessary to state in the body of the bill that an emergency exists, in order that it may be put into immediate effect, for so the Constitution declares, but the grounds of the emergency need not be stated.

2. STATUTES — *Constitutionality — Emergency Clause — Review by Courts.*—The legislature is the sole judge of what shall constitute an emergency which will justify putting an act into immediate effect, and its action is not reviewable by the courts. Whether the reasons actuating the legislature to take such action were good or bad, reasonable or unreasonable, are not subjects of judicial inquiry. It is a matter resting wholly with the legislature.

3. CONSTITUTIONAL LAW—*Constitution not a Grant of Powers.*—The Constitution of the State is not a grant of legislative powers to the General Assembly, but is a restraining instrument only, and, except as to matters ceded to the federal government, the legislative powers of the General Assembly are without limit.

4. STATUTES—*Presumption in Favor of Constitutionality.*—Every presumption is to be made in favor of the constitutionality of a statute, and it will never be declared to be unconstitutional unless it is plainly and clearly so. If any reasonable doubt exists as to its constitutionality, the act will be upheld. To doubt is to affirm. The mere passage of a statute is an affirmance by the General Assembly of its constitutional power to adopt it, and the case must be plain indeed before a court will declare a statute null and void.

5. CONSTITUTIONAL LAW—*Construction by Legislature.*—Furthermore, in cases of doubt, the construction placed upon the Con-

50

stitution by the legislature itself is entitled to consideration, but will not be permitted to overturn plain language.

6. MUNICIPAL CORPORATIONS—*Change of Form of Government— Election—Writ of Error.*—After an election was duly ordered and held under Acts 1914, page 165, as amended by Acts 1916, page 672, and Acts 1918, page 402, the city petitioned asking to be made a party defendant to the proceeding whereby the election was ordered and held, and that the petitioners upon whose petition the election was ordered and held should be made defendants to the city's petition. Subsequently, a number of electors tendered their petition also asking to be made parties defendants. This procedure adopted by the city and the petitioning electors was anomalous. It was neither an ordinary common law action nor a suit in equity. It was not authorized by any statute, nor does it conform to the extraordinary common law remedies of *mandamus, quo warranto,* or *certiorari.* It is an attempted intervention in a proceding made *ex parte* by the statute. The action of the city in intervening in the cause was in the nature of an appearance of an *amicus curiae,* and was advisory only. It conferred no rights upon the city.

7. MUNICIPAL CORPORATIONS—*Change of Form of Government— Election—Writ of Error.*—In a proceeding under Acts 1914, page 165, as amended by Acts 1916, page 672, and Acts 1918, page 402, for an election to change the form of government of a city to that known as the "City Manager Plan," the judge of the circuit court acts in a ministerial capacity, and to his finding of facts certified to the clerk of the city council no writ of error lies.

8. MUNICIPAL CORPORATIONS—*Change of Form of Government— Election—Writ of Error.*—Under Acts 1914, page 165, as amended by Acts 1916, page 672, and Acts 1918, page 402, the judge was to ascertain and certify a fact, to-wit, Did "a majority of the electors, qualified to vote at such election," vote for or against the proposed change? This, in the instant case, the judge did, and whether his construction of the statute was right or wrong, or his duty was ministerial or judicial, no writ of error to, or appeal from, his order is given by these acts or any other statute of this State.

9. PUBLIC OFFICERS—*Ministerial or Judicial Duties.*—Whether a duty imposed is judicial or ministerial is to be determined by the nature of that duty, and not by the tribunal or person that is to discharge it. Judicial tribunals are often charged with the performance of purely ministerial functions, and it is equally true that executive or ministerial officers are sometimes charged with judicial or *quasi* judicial functions. The duty to ascertain a fact from evidence does not *per se* render the duty judicial.

10. MUNICIPAL CORPORATIONS—*Change of Form of Government—Duties of Judge Judicial or Ministerial.*—In the cases at bar, the statute imposed upon the circuit court, or the judge thereof, two duties, which so far as their nature is concerned could just as well have been imposed on any ministerial, or executive officer. The first of these was the ordering of the election, and the second the certifying of the results thereof to the city council.

11. PUBLIC OFFICERS—*Failure to Discharge Duties—Mandamus.*—Ministerial and executive officers, in the course of their official conduct, are construing statutes every day, and yet if, in consequence of their misconstruction, they fail to discharge their duties they may be compelled to do so.

12. PUBLIC OFFICERS—*Quo Warranto—Mandamus.*—The usual common law method of contesting title to an office is by a writ of *quo warranto,* or a writ in the nature of a writ of *quo warranto,* and that procedure is still available in this State. While it is generally held that the title to an office cannot be tried indirectly by a writ of *mandamus,* the practice of trying title to office by *mandamus* in Virginia is sustained by a line of decisions covering over a century of the State's judicial history, and it is now the well settled practice of the State, and affords a simple, expeditious, adequate and complete remedy in such cases.

Error to an order of the Circuit Court of city of Roanoke, in a proceeding on the petition of M. C. Elliott and others for an election submitting to the voters of the city of Roanoke the question of changing its form of government.

*Writs of error dismissed.*

The opinion states the case.

*S. Hamilton Graves* and *Hall, Wingfield & Apperson,* for the plaintiffs in error.

*Jackson & Henson* and *C. A. McHugh,* for the defendants in error.

BURKS, J., delivered the opinion of the court,

Section 117 of the Constitution of this State, as amended, authorizes the General Assembly to provide from time to time for the various cities and towns of the Commonwealth such form or forms of municipal government as it may deem best, but that no form or forms shall become operative except as to such cities or towns as may thereafter adopt the same "by a majority vote of its qualified electors at an election to be held as may be prescribed therefor' by law." This amendment became effective in 1912. In 1914 the legislature enacted a statute to put it into operation. (Acts 1914, p. 165). In 1916 this statute was amended (Acts 1916, p. 672), and again in 1918 (Acts 1918, p. 402). The amendment of 1918 was put into immediate effect by an emergency clause, and the election was held May 6, 1918. This amendment is assailed as unconstitutional because the emergency clause merely states the existence of the *fact* of emergency, and does not state the *grounds* of the emergency. The constitutional provision upon which this claim is based is contained in section 53 of the Constitution, which forbids putting statutes other than appropriation bills into immediate operation, "unless in case of emergency (which emergency shall be expressed in the body of the bill)." The Acts of 1914 and 1916 each provided that a majority of the qualified voters *authorized to vote at such election* must vote for the proposed change in order to secure its adoption. The act of 1918, however, changed the language of this clause, and followed the language of the Constitution requiring the election to be carried "by a majority vote of the qualified electors."

On April 4, 1918, M. C. Elliott and others, constituting the requisite number of electors, filed a petition before the judge of the circuit court of the city, praying that an election be ordered for the purpose of submitting to the quali-

fied voters of the city the question of changing the form of government of the city as then organized to that known as the "City Manager Plan," in accordance with the act of Assembly entitled, "An act to provide for a change in the form of government of cities having a population of less than 100,000, and of towns, and to provide in what manner such cities and towns may adopt such form of government," approved March 20, 1916, "and of acts amendatory thereof." The petition was accompanied by the certificate of the clerk of the corporation court, as required by the statute, showing that the number of voters qualified to vote at the last election held in the city for municipal officers was 4456. The election was duly ordered, and was held on May 6, 1918. The commissioners of election certified to said judge that 1470 votes were cast at the election, and that of those 368 were against the proposed change of government, and 1102 were in favor of the proposed change of government. Before any order was made by the judge, to-wit, on May 10, 1918, the city of Roanoke appeared by counsel and tendered its petition asking to be made a party defendant to the proceeding whereby the election was ordered and held, that the petitioners upon whose petition the election was ordered and held should be made defendants to the city's petition, and that the court declare that the proposed change in the form of government of the city had not been adopted by the requisite majority. The city was admitted as requested, and on May 11, 1918, the judge entered the following order:

"It appearing that the election held in the city of Roanoke on the 6th day of May, 1918, pursuant to the order and writ made and issued by the judge of this court on the 4th day of April, 1918, whereby it was submitted to the qualified electors of said city whether or not the existing form of municipal government of the said city should be changed to that known as the 'City Manager Plan,' as de-

fined and fully set out in chapter 392 of the Acts of 1916 and acts amendatory thereof, 1102 votes 'were cast in favor of said change and 368 votes were cast against said change, and it appearing further therefrom that said eleven hundred and two (1102) votes so cast in favor of said change of form of government, constitute a majority of the qualified electors of the said city, according to the true intent and meaning of the Constitution of Virginia and of said act as amended by act approved March 14, 1918; and it further appearing that said election was held after the notice provided in said order and writ as required by law, and that said election was conducted both as to the notice and manner of holding the same in accordance with the provisions of the law, and it is therefore so ordered.

\*    \*    \*    \* .    \*    \*    \*    \*   . \*    \*

"It is further ordered that pursuant to the will of the people of said city, as declared by a majority vote of the qualified electors voting in the manner prescribed by law, the existing form of municipal government of said city be and the same is hereby changed to that known and defined as the 'City Manager Plan,' as set out and prescribed in chapter 392 of the Acts of 1915 [1916] an acts amendatory thereof.

"It is further ordered that the clerk of this court shall forthwith certify a copy of this order to the council of the city of Roanoke for recordation upon its journal, as required by law."

To this order a writ of error was awarded to the city of Roanoke.

Subsequently, to-wit, on May 16, 1918, Morris Manihan and sixteen others, electors of said city, tendered their petition also asking to be made parties defendants to the petition of M. C. Elliott and others, upon whose petition the election had been ordered and held, and praying for the same relief as was prayed by the city of Roanoke. Elliott

and others resisted the filing of this petition on the ground that the cause was ended and the petition could not then be filed, and, further, if intended to contest the election, it could not be entertained, as the notice required by the statute had not been given. The petitioners stated that they did not ask that their petition be treated as a petition to contest the election, and thereupon the court entered an order declining to permit the petition of Manihan and others to be filed. To this order a writ of error was awarded to Manihan and others.

A number of questions of interest and importance have been ably argued before us, but, in the view we take of the case, it will be unnecessary to pass upon them.

It has been urgently insisted, both in the oral argument and in the briefs, that the emergency clause of the act of 1918 is not sufficient compliance with the provision of section 53 of the Consitution, postponing the operation of acts, other than appropriation acts, until ninety days after the adjournment of the General Assembly, "unless in case of emergency (which emergency shall be expressed in the body of the bill)." Plaintiffs in error insist that the words "which emergency" are entirely superfluous, if it is sufficient simply to declare the fact of the existence of an emergency, and that, in order to give them any effect, it is necessary that "the facts or conditions constituting the emergency shall be expressed or declared." Such a construction would read into the Constitution words which the convention which framed it did not see fit to use. If such had been its intention, nothing would have been easier than to have said so in language that was plain and unequivocal. The word "emergency" in parentheses was apparently placed there merely to point out with definiteness and more certainly the antecedent to which the word "which" referred. The constructin would be the same if the second word "emergency" and the parentheses were omitted altogether,

and the sentence read "unless in case of emergency which shall be expressed in the body of the bill." We do not omit the word "emergency," however, in our interpretation of the clause, but give to it its apparent and natural meaning, in the connection in which it is used, that of emphasis and certainty. It is necessary to state in the body of the bill that an emergency exists, in order that it may be put into .immediate effect, for so the Constitution declares, but counsel very properly admit that "the legislature is the sole judge of what shall constitute an emergency which will justify putting an act into immediate effect," as the authorities so hold. See cases cited in 33 Cyc. 1193, 1194. It is for the legislature to "ascertain and declare the fact of the existence of the emergency, and their determination is not reviewable elsewhere. The Constitution has vested the law-making department of the government with power to determine· that question * * * and such determination is not made reviewable by the courts." *Biggs* v. *McBride,* 17 Or. 647, 21 Pac. 880, 5 L. R. A. 118-19. Whether the reasons actuating the legislature to take such action were good or bad, reasonable or unreasonable, are not subjects of judicial inquiry. It is a matter resting wholly with the legislature. It was well· suggested by counsel for the· defendants in error that—

"All the members of the legislature might agree that an emergency existed for the passage of the act, yet they might disagree as to the cause of the emergency, or as to the facts which constitute the emergency. How then would they vote? Surely, if all the legislature agreed that an emergency existed, but they were all split up as to the facts which constituted the emergency, they should not be denied the privilege of passing the bill as an emergency bill because they disagreed as to the facts which constituted the emergency."

If the legislature is the sole judge of the existence of an

emergency, and its action is not reviewable, why should it state the reasons actuating it, in the absence of a constitutional requirement to that effect? Why should it state reasons which no one could call in question? We confess our inability to answer the question.

The reason for postponing the operation of statutes, as is done by section 53 of the Constitution, was that the people might be informed of their contents before they became effective. The reason for making exceptions to the rule was manifest necessity. The reason for stating that a particular act belonged to the emergency class was to call that fact to the attention of members of the legislature, not of the people, so that they might carefully examine it and determine for themselves whether or not the act should be so classified. Notice to the people of an alleged fact which they could not controvert would be vain.

If it was intended to require the legislature to state the reasons for the emergency, the convention would have used language similar to that of the Kentucky Constitution, "but the reasons for the emergency that justifies this action must be set out at length in the journal of each House." (Const. §55.) Quoted in *Commissioners* v. *George* (Ky.), 47 S. W. 782, 84 Am. St. Rep. 454.

Counsel for the plaintiffs in error say in their brief that "after exhausting the authorities accessible to the writer, but one case has been found which is specific upon the question here presented," and cites *Biggs* v. *McBride, supra.* Defendants in error have not been able to add any other, nor have we found any.

The provision of the Constitution of Oregon which was under consideration in that case was as follows:

"No act shall take effect until ninety days from the end of the session at which the same shall have been passed, except in case of emergency, which emergency shall be declared in the preamble or in the body of the law." (Article 4, § 28.)

The emergency clause in the act considered was as follows, to-wit: "Inasmuch as the amendments herein proposed would greatly tend to benefit the people of this State, and there is urgent necessity therefor, this act shall take effect and be in force from and after its approval by the Governor." It did not in terms state that an emergency existed, nor state any fact or facts showing that the act "would greatly tend to benefit the people," and the question before the court was, whether or not what was so stated was a sufficient statement of the existence of an emergency. The court held the emergency clause sufficient, and the act constitutional.

Counsel for the plaintiffs in error make the following quotation from the opinion of the court, to show that the court held that it is necessary to state the reasons for the emergency: "It is the fact of the existence of any event or occasional combination of circumstances, which calls for immediate action or remedy, or the fact that some pressing necessity or exigency exists which enables the legislature, by declaring the same in the preamble or body of the act, to put the same in force sooner than the time prescribed in the Constitution in cases where there is no such emergency, or the same is not so declared; but, in all such cases, it is for the legislature to ascertain and declare the fact of the existence of the emergency, and their determination is not reviewable elsewhere. The Constitution has vested the law-making department of the government with the power to determine that question (*Carpenter* v. *Montgomery*, 7 Black [Ind.] 415; *Gentile* v. *State*, 29 Ind. 409); and such determination is not made reviewable in the courts. No doubt the emergency must be declared in the body or preamble of the act, but, if there is no fact, event or state or condition of affairs mentioned which the legislature determines creates an emergency, no difference how strongly or directly it may be asserted in the act that it is necessary that it should go

into effect immediately, the legislative declaration must fail, for the reason the Constitution is not complied with."

If the contention of the plaintiffs in error be correct, that the latter part of the paragraph quoted means that the *grounds* of the emergency must be stated, then it is in conflict with the other statements of the paragraph, that "it is for the legislature to ascertain and declare the *fact of the existence of the emergency and their determination is not reviewable elsewhere.* The Constitution has vested the law-making department of the government with the power to determine that question * * * and *such determination is not made reviewable in the courts."* (Italics supplied.) It must be borne in mind that in the act there under consideration no emergency was *expressly* stated, and the court was considering whether what was stated amounted in effect to a declaration of an emergency, and the language used must be read in this light. It seems more probable, therefore, that the court meant to hold that where no emergency was *expressly* declared, the court would consider the language used and determine for itself whether or not it was tantamount to a declaration of the existence of the fact of an emergency, and that no matter how strongly or directly it might be asserted in the act that it was necessary that it should go into effect immediately, such assertion would be ineffectual unless the act either contained an emergency clause, or what, in effect, amounted to such a clause, for otherwise it would not be in compliance with the Constitution. The words, "no difference," are used in the sense that it was a matter of indifference, or of no consequence. This construction makes the paragraph quoted harmonious and in accord with the later Oregon case hereinafter cited.

Some time after this decision was rendered, the Constitution of Oregon was amended so as to restrict the use of the emergency clause to laws "necessary for the preserva-

tion of the public peace, health or safety." After this amendment, the emergency clause could not be annexed to a bill unless the proposed law was "necessary for the preservation of the public peace, health or safety." The Constitution designated the class of cases, and the only class, to which the emergency clause could be annexed. After the adoption of the amendment, the legislature of Oregon passed an act containing the following emergency clause: "* * * it is hereby adjudged and declared that existing conditions are such that it is necessary for the immediate preservation of the public peace, health or safety; therefore an emergency is hereby declared to exist, and this act shall take effect * * * after its approval by the Governor." It was insisted that the emergency clause was not sufficient because it did not set forth the facts creating the emergency. But it was held that the "legislature has the exclusive power to declare an emergency without setting out the facts creating the emergency." *Bennett Trust Co.* v. *Sengstacken,* 58 Ore. 333, 113 Pac. 863. The report of the case does not show that there had been any change in the language of the emergency clause, but that another section of the Constitution had been so amended as to restrict the class of cases to which the emergency clause might be annexed. In the course of the opinion of the court, in discussing the amendment and referring to the well known rule of pleading, that pleadings must state facts and not legal conclusions, it is said: "The argument of plaintiffs' counsel on this point is analogous to the rule of pleading requiring a statement of facts from which a court may be able to draw a desired conclusion of law. In such cases it is conceded to be insufficient, in point of law, merely to plead such conclusion without stating the facts authorizing it. Counsel would apply this argument to the case in hand so as to require the legislative assembly to set out in detail the ultimate facts it relied upon as au-

thorizing the declaration of an emergency, in order that a court called upon to construe the act may consider the facts as alleged by the legislative assembly, not to call in question the truth of the legislative statement of facts, but to determine whether the emergency is a proper conclusion to be drawn from such facts. But no such strict rule hampers the legislative branch of the State government. It has the exclusive power to declare that its enactments are necessary for the immediate preservation of the public peace, health, or safety, and that hence an emergency exists on account of which the act shall take effect when the legislative process, as applied to the act in question, is fully completed." There is no intimation in the opinion that it is in any way in conflict with *Biggs* v. *McBride, supra,* and as we construe it, the case holds that the statement of the *fact* of emergency, without giving the reasons therefor, is sufficient.

In *Commissioners* v. *George* (Ky.), 47 S. W. 779, 84 Am. St. Rep. 454, the court was considering the Constitution of Kentucky which required that the *reasons* for the emergency should be set out at length in the journal of each house. Our Constitution is so entirely different that the case throws no light on the subject.

In *Nebraska* v. *Pacific Express Co.,* 80 Neb. 823, 115 N. W. 619, 18 L. R. A. (N. S.) 664, the following was held to be insufficient as an emergency clause: "Sec. 7 (Emergency). This act shall take effect on * * * after its passage and approval." We do not regard this clause as at all the equivalent of the clause under consideration. Each section of the act contained one or more catch words simply to indicate the subject dealt with in the section. These catch words were manifestly not regarded as any portion of the sections to which they were prefixed, and the court declared the section not a sufficient compliance with the constitutional requirement, without discussion.

It is true that, in *Couk* v. *Skeen,* 109 Va. 6, 63 S. E. 11, this court, in discussing the contention that the emergency provided for in section 50 of the Constitution should be expressed in the body of the act, did say that "the kind of emergency which might make it necessary for a bill to take effect sooner than ninety days after the adjournment of the General Assembly should be expressed in the body of the bill," but the court was there considering simply whether, under section 50 of the Constitution, there should be *expressed in the act* anything on the subject of emergency, and not whether the *fact* of the *emergency* or the grounds of the emergency should be stated. No such distinction was sought to be made, or was in the mind of the court at that time, and what was not in the mind of the court was not decided. Counsel for the plaintiffs in error properly concede that the case is *not authority* on the question now before the court, but seem to think it throws some light on it. For the reason stated, we cannot concede to it even this much.

The contention that the legislature has exceeded its powers and that a statute is unconstitutional always presents a question for serious consideration. The Constitution of the State is not a grant of legislative powers to the General Assembly, but is a restraining instrument only, and, except as to matters ceded to the federal government, the legislative powers of the General Assembly are without limit. Every presumption, therefore, is to be made in favor of the constitutionality of a statute, and it will never be declared to be unconstitutional unless it is plainly and clearly so. If any reasonable doubt exists as to its constitutionality, the act will be upheld. To doubt is to affirm. The mere passage of a statute is an affirmance by the General Assembly of its constitutional power to adopt it, and the case must be plain indeed before a court will declare a statute null and void. These principles have been repeatedly

announced by this court from a very early date. *Eyre* v. *Jacob,* 14 Gratt. (55 Va.) 422, 73 Am. Dec. 367; *Commonwealth* v. *Drewry,* 15 Gratt. (56 Va.) 1; *Brown* v. *Epps,* 91 Va. 726, 21 S. E. 119, 27 L. R. A. 676; *Commonwealth* v. *Moore,* 25 Gratt. (66 Va.) 951; *Va-Tenn. C. & I. Co.* v. *McClelland,* 98 Va. 424, 36 S. E. 479; *Prison Association* v. *Ashby,* 93 Va. 667, 25 S. E. 893; *Whitlock* v. *Hawkins,* 105 Va. 242, 53 S. E. 401; *Button* v. *State Corp. Com.,* 105 Va. 634, 54 S. E. 769; *Willis* v. *Kalmbach,* 109 Va. 475, 64 S. E. 342, 21 L. R. A. (N. S.) 1009.

Furthermore, in cases of doubt, the construction placed upon the Constitution by the legislature itself is entitled to consideration, but will not be permitted to overturn plain language. *Day* v. *Roberts,* 101 Va. 248, 43 S. E. 362.

In the cases at bar, not only has the legislature affirmed its constitutional power by exercising it, but in a large number of cases has enacted statutes containing emergency clauses in the very language of the statute before us. In four sessions it passed upwards of seventy of such statutes. It is true that its action in this respect has not been uniform, and that, in a much larger number of cases, the *grounds of the emergency* have been stated, but the omission in such a large number of cases tends to show that it regarded the insertion of the grounds as a precautionary measure only which could do no harm, but was in fact unnecessary. If the insertion of the grounds had been deemed necessary, the legislature would not have omitted it in numerous instances at every session since the adoption of the Constitution. The court will not presume that this was an oversight. The omission to state the *grounds* of the emergency in the act of 1918 was not a plain violation of section 53 of the Constitution, and the statute must, therefore, be upheld as a valid constitutional enactment and in force from its passage.

A motion was made to dismiss these writs of error upon

the ground that the judge of the circuit court, in this *ex parte* proceeding, was acting in a merely ministerial capacity, and that to his finding of facts, which he certified to the clerk of the city council, no writ of error lies. The procedure adopted by the plaintiffs in error was anomalous. It was neither an ordinary common law action nor a suit in equity. It was not authorized by any statute, nor does it conform to the extraordinary common law remedies of *mandamus, quo warranto* or *certiorari*. It is an attempted intervention in a proceeding made *ex parte* by the statute, and we are of opinion that the motion should be sustained.

In *Manns* v. *Givens*, 7 Leigh (34 Va.) 689, a deed was offered for record to the county court, and at the same time evidence of its due execution, but the court refused to admit it to record because the justices "deemed the evidence in support of it inadmissible and insufficient." There were two attesting witnesses to the deed, one of whom was dead and the other a non-resident of the State, and the evidence offered was the deposition of the absent witness, taken after due notice; and the witness was subjected to cross-examination. This witness testified to the due execution and attestation of the deed. This court held that the evidence was admissible and sufficient, that the county court, as to this matter, was acting as a court of registry only, that its office was ministerial solely, and that *mandamus* was the proper remedy to compel the court to admit the deed to record.

In *Delaney* v. *Goddin*, 12 Gratt. (53 Va.) 266, the county court refused to record the report of the surveyor of a lot of land sold by the sheriff for non-payment of the tax upon it. The motion to record was made by the purchaser at the sheriff's sale, and was resisted by the former owner. The statute provided that "the county court, unless it see some objection to such report, shall order the same to be recorded." It was insisted on behalf of the former owner

that the county court was acting judicially and had the right to examine into the regularity and validity of the proceedings previous to the report, but this court held that the duty devolved upon the county court was in no wise judicial, but purely ministerial, and that this ministerial duty was restricted to the consideration of objections to the *report,* and the court had no power to make investigations back of the *report.* It was also held by this court that *mandamus* was the proper and *only remedy* for the correction of the error committed by the county court. Two of the judges (Allen and Moncure) dissented on the question of whether the duties of the county court were purely ministerial. The same question came again before this court in *Randolph Justices* v. *Stalnaker,* 13 Gratt. (54 Va.) 523, when *Delaney* v. *Goddin, supra,* was affirmed. Judge Allen, who had dissented in the previous case, delivered the opinion of the court, and, in the course of it says: "The principal questions presented by the record have been settled by the decision of this court in the case of *Delaney* v. *Goddin,* 12 Gratt. (53 Va.) 266. That case was elaborately argued and maturely considered; and all the judges were of opinion that the authority of the county court was limited to the enquiry whether the report of the surveyor is in conformity with the provisions of the section under which it is made; and if free from objection in this respect, it becomes the imperative duty of the court to order the report to be recorded. And a majority of the court held, that in passing on such question the county court is vested *with no judicial power,* but acts in a capacity purely ministerial and that an error in refusing to order the report of the surveyor to be recorded can only be corrected by *mandamus.*

"The objection growing out of the alleged complicity of the sheriff with the purchaser, or whether the taxes and damages and cost of survey, where a survey was made, were paid by a party authorized by law to redeem to the proper

52

party and within the proper time, are matters not appearing on the report or the list of sales, or anything connected therewith. The proper determination of them would involve inquiries into matters of law and fact which the county court, acting ministerially and in this *ex parte* proceeding, cannot, in conformity with the decision in the case referred to, enter into."

In *Lewis* v. *Christian,* 101 Va. 135, 43 S. E. 331, the oyster inspector was required by statute to determine whether a particular oyster rock was natural oyster rock according to a designated survey and report. If so, and stakes had been placed on the natural oyster rock or bed, it was his duty to have them removed. On an application for a *mandamus* to have removed stakes placed upon certain oyster rocks alleged to be within said survey and report, it was said that it was the imperative duty of the oyster inspector to have the stakes removed if placed on natural rocks or beds, as shown by said survey and report, and he "has to determine the existence of these facts," but that his duty was none the less ministerial because he had to determine whether or not the facts existed which made it his duty to act. In other words, the duty to ascertain a fact from evidence does not *per se* render the duty judicial.

It is not easy to lay down a general rule by which it may always be determined what acts are judicial and what are ministerial, and we shall not attempt it. But it is safe to say that whether a duty imposed is judicial or ministerial is to be determined by the nature of that duty, and not by the tribunal or person that is to discharge it. That judicial tribunals are often charged with the performance of purely ministerial functions is well illustrated by the cases hereinbefore cited, and it is equally true that executive or ministerial officers are also sometimes charged with judicial or *quasi* judicial functions. See *Thurston* v. *Hudgins,* 93 Va. 780, 20 S. E. 966, and *Rowe* v. *Drisgell,* 100 Va. 137, 40 S. E. 609; note in 44 Am. St. Rep. at p. 46, and cases cited.

In the cases at bar, the statute imposed upon the circuit court, or the judge thereof, two duties, which so far as their nature is concerned could just as well have been imposed on any ministerial, or executive officer.   The first of these was the ordering of the election, and the second the certifying of the results thereof to the city council.   As to the first of these duties it was too plainly ministerial to admit of argu-- ment.   When the petitions were presented, together with the certificate of the clerk required by the statute, it was a matter of the simplest nature to ascertain whether the number of electors signing the petition amounted to ten *per cent.* of the number certified by the clerk.   When this fact was ascertained, the statute is mandatory that the court or judge "shall pass an order" directing the election to be held. No discretion is allowed.

After the election has been held, the statute requires that, "returns of the election shall be certified by the commis- sioners of election, or their clerk, to the court, or the judge thereof in vacation; and if it shall appear that the proposed change has not been adopted by a majority vote of the quali- fied electors, an order shall be entered of record accordingly, and no other election for any change in the form of gov- ernment of such city or town shall be held within two (2) years after such election; but if the said proposed change is adopted by a majority vote of the qualified electors, the court, or judge thereof, shall enter an order accordingly, a copy of which shall be forthwith certified by the clerk of such court to the council of such city or town for recorda- tion upon its journal."  Here, again, no discretion is vested in the court or judge.   A fact is to be ascertained, to-wit, "if the said proposed change is adopted by a majority vote of the qualified electors."   If it is, then the statute is manda- tory, "the court, or judge thereof, shall enter an order accordingly."   It is sought to invest the court or judge with discretion by arguing that the words "a majority vote of

the qualified electors" had to be construed that they are of doubtful meaning, and that their construction is a judicial act. The same may be said of any statute under which an officer has to act. Ministerial and executive officers, in the course of their official conduct, are construing statutes every day, and yet if, in consequence of their misconstruction, they fail to discharge their duties they may be compelled to do so. This is fully illustrated by the cases of *Delaney* v. *Goddin, supra; Randolph* v. *Stalnaker, supra,* and *Manns* v. *Givens, supra.* Certain facts were to be ascertained by the court or judge, but as said in *Lewis* v. *Christian, supra,* "that does not make his duty any the less ministerial." No judicial investigation was required to ascertain these facts. No day in court was given to any one, no process was to be issued, no person to be notified, and no time or place fixed for the investigation. The court or judge was to ascertain these facts just as any ministerial or executive officer would ascertain facts as a basis for official action. The investigation to ascertain the facts under such circumstances, without the presence of parties, or any provision for summoning them, or for their voluntary appearance, could hardly be called a judicial investigation in any proper sense of the term. When the facts were thus ascertained, the duty devolving upon the court or judge became imperative. No discretion in the matter was wasted in them. All that remained to be done was to "enter an order accordingly," and from such order no provision is made for an appeal.

The act under which the judge of the circuit court acted in these cases constituted him a mere canvassing or returning officer, with no power, while so acting, to go behind the returns or to inquire into the legality of the votes cast. The proceeding before him was wholly *ex parte.* The returns of the election were to be certified by the commissioners of election to the judge, and if it appeared that "a majority of the qualified electors authorized to vote at such election"

favored the change, he was required to "enter an order accordingly," and the clerk of the court was to certify a copy of the order to the clerk of the city council. When he had done this, his powers in this respect ceased. He had no power to order or declare what the form of the city government should be in the future. The duty thus imposed, as we have stated, was ministerial and not judicial. It is said that " in nearly all the States, the board of canvassing officers are held to be ministerial officers only, whose duty it is to receive the returns from the various precincts or counties, as the case may be, and declare the results, as shown by the face of the returns." 10 Am. & Eng. Encl. Law (2d ed.), p. 746, and cases cited. In the cases at bar, the judge was to receive the returns from the commissioners of election and to "declare the results, as shown by the face of the returns." This was a ministerial duty. *McKinney* v. *Peers,* 91 Va. 684, 22 S. E. 506. If, after stating the total votes cast and the number of votes for and against the change, he drew a wrong conclusion as to the certificate he should make, that did not render the duty imposed upon him any the less ministerial. He was to ascertain and certify a fact, to-wit, Did "a majority of the electors, qualified to vote at such election," vote for or against the proposed change? This the judge did, and while we are of opinion that he was then discharging a ministerial duty, still whether his construction of the statute was right or wrong, or his duty was ministerial or judicial, no writ of error to, or appeal from, his order is given by this or any other statute of this State. In several of the cases above cited, the judges misconstrued the law, but it was held that no writ of error or appeal was allowable. See especially *Manns* v. *Givens, supra; Delaney* v. *Goddin, supra.*

The action of the city in intervening in the cause was in the nature of an appearance of an *amicus curiæ,* and was advisory only. It conferred no rights upon the city.

The usual common law method of contesting title to an office is by a writ of *quo warranto,* or a writ in the nature of a writ of *quo warranto,* and that procedure is still available in this State. It is generally held that the title to an office cannot be tried indirectly by a writ of *mandamus* (26 Cyc. 255, and cases cited), but the latter remedy is too well settled in this State to now admit of question. It is said that the practice of trying title to office by *mandamus* is sustained by a line of decisions covering over a century of the State's judicial history, and that it is now the well settled practice of the State, and affords a simple, expeditious, adequate and complete remedy in such cases. *Sinclair* v. *Young,* 100 Va. 284, 289, 40 S. E. 907.

For the reasons hereinbefore given, the writs of error will be dismissed as having been improvidently awarded.

*Dismissed.*