# CASES DECIDED

IN THE

# Supreme Court of Appeals

## OF VIRGINIA

### 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

ALBEMARLE OIL AND GAS COMPANY, INC., v. J. R. MORRIS, E. A. JOACHIM AND J. Y. BROWN.

January 17, 1924.

1. CONSTITUTIONAL LAW—*Legislative Power—In General.*—The legislature of the State possesses all legislative power not prohibited in express terms or by necessary implication by the State Constitution or the Constitution of the United States.

2. CONSTITUTIONAL LAW—*Strict Construction—Presumption in Favor of Constitutionality of Statute.*—In doubtful cases, the .limitation, by a State Constitution, of the power of the legislature, is to be strictly construed, and the courts should resolve all doubts in favor of the constitutionality of the act. Every possible presumption is in favor of the validity of the act until overcome beyond all reasonable doubt.

3. CONSTITUTIONAL LAW—*Retroactive Effect of—Section 117 of the Constitution as Amended in 1920—Case at Bar.*—The authority to organize a commission form of government for Charlottesville was given by the people at an election held December 7, 1920. The act of March 24, 1922 (Acts 1922, chapter 411), amending and re-enacting the charter of Charlottesville, did not *provide* a commission form of government, but recited in terms, in the preamble, that the qualified voters of the city, by said election, adopted a "modified commission form" of government, and amended and modified to a slight extent the form of government so adopted, providing for three commissioners instead of five; and while no specific reference was made to the election in the act of February 28, 1922 (Acts 1922, chapter 109), amending the charter, ample reference was made to the purpose and

effect of that act; the same being to cure any possible defects in the preceding charter of March 16, 1920, and to validate all proceedings had thereunder, which included the election of December, 1920, adopting a commission form of government.

4. MUNICIPAL CORPORATIONS—*Form of Government—Request of the People.*—Subsection (c) of section 117 of the Constitution of 1902, as amended in November, 1920 (Acts 1920, chapter 350), provides that the General Assembly, at the request of any city or town made in manner provided by law, may grant to it any special form of organization and government authorized by subsection (b). While this contemplates and requires some kind of request, the form of the request is left to the discretion of the legislature. Whether it shall be by the council, or by mass meeting, or other particular mode, which the legislature might think satisfactory, the Constitution does not say. The amendment contains nothing which is intended to inhibit or limit the discretion of the legislature. The form of government of cities and towns is placed by the Constitution in the discretion of the legislature.

5. MUNICIPAL CORPORATIONS—*Form of Government—Request of the People—Case at Bar.*—In the instant case the legislature, by Acts 1922, chapter 411, amended the charter of the city of Charlottesville providing for three commissioners instead of five, and the relator contended that the words in subsection (c) of the Constitution of 1902, as amended in November, 1920 (Acts 1920, chapter 350), "at the request of any city or town made in manner provided by law" made it necessary as a condition precedent that the legislature first provide a method by which the request should be made, and that as the legislature had not done so at the time of the enactment, the enactment was unconstitutional.

*Held:* That while the clause of the Constitution under consideration contemplated that the legislature should enact a law in advance, prescribing how the request was to be made, its failure to do so did not invalidate the act of March 24, 1922 (Acts 1922, chapter 411), granting the charter, where the form of the request therein stated was approved by the legislature.

6. CONSTITUTIONAL LAW—*Provisions Directory or Mandatory—Methods of Procedure.*—Constitutional provisions are directory and not mandatory, where they refer to matters merely procedural, or confer discretion on the legislature.

7. CONSTITUTIONAL LAW—*Statutes—Existence of Conditions Requiring Legislation—Legislative Procedure—Questions for Determination of Legislature.*—While the courts can pass upon the constitutionality of legislative enactments, they cannot overthrow legislative determination of the existence of conditions with respect to its own procedure, or the existence of conditions satisfying it of the propriety of its action. Thus, where the legislature of the State has granted a charter to

a community, it must be assumed that its discretion in that regard has been properly exercised.

8   QUO WARRANTO—*Issuance of Right—Organization and Municipal Corporation.*—The writ of *quo warranto* does not issue as a matter of course, however fundamental may be the irregularities in the organization of a municipal government.   The court, in determining the question, will consider the public interest involved, and the extent of the injury complained of, and where little practical benefit would result to the relator, and injury and inconvenience would result to the public, will deny the writ.

9.   QUO WARRANTO—*Validity of Municipal Government—Interests of the Relator Slight—Case at Bar.*—In the instant case, a proceeding by information in the nature of a *quo warranto*, to determine the validity of a city government, the interests of the relator were slight, and any other form of government would probably levy the same taxation and impose the same restrictions upon the relator, as those of which it complained.   The interest of the public was great.   The present government had taken office and performed all the functions of government.   It had installed police, levied taxes, issued bonds, let contracts for public improvements, etc.   The granting and successful prosecution of the present writ would result in the suspension of all municipal government.

   *Held:*   That the lower court did not err in vacating the writ and dismissing the petition.

10.   MUNICIPAL CORPORATIONS—*Form of Government—Constitutionality of the Act of March 24, 1922 (Acts 1922, Chapter 411), Amending and Reenacting the Charter of the City of Charlottesville.*—In the instant case it was held that the act of March 24, 1922 (Acts 1922, chapter 411), was constitutional; that the sufficiency of the occasion for that act had been determined by the legislature, whose determination was beyond the control of the court; that the issuance of the writ of *quo warranto* would jeopardize the public interest and violate a sound public policy, without furthering the interests of relator; and that the present government of the city of Charlottesville was legal and valid.

Error to a judgment of the Corporation Court of the city of Charlottesville upon an information in the nature of a writ of *quo warranto*.   Writ vacated and petition dismissed.   Petitioner assigns error.

*Affirmed.*

The opinion states the case.

*R. C. Walker, A. L. Pitts, Jr., R. E. Byrd,* and *Perkins, Walker & Battle,* for the plaintiff in error.

*John S. Graves, Timberlake & Nelson,* and *Allen, Walsh & Michie,* for the defendants in error.

WEST, J., delivered the opinion of the court.

The object of this proceeding is to test the validity of the present organized government of the city of Charlottesville, Virginia.

An information was filed in the name of the State of Virginia at the relation of Albemarle Oil and Gas Company, Inc., in the nature of a writ of *quo warranto,* under sections 5842 and 5844 of the Code of 1919, and other laws applicable thereto, to which J. R. Morris, E. A. Joachim and J. Y. Brown, constituting the council of the city, were made parties defendant.

Defendants demurred to the petition and moved to vacate the writ issued thereon, and filed an answer which was used as an affidavit in support of the motion to vacate.

The court sustained the demurrer and the motion to vacate, and dismissed the petition. The plaintiff company assigns error.

Charlottesville was first incorporated as a city in 1888. In 1916, by annexation proceedings, it became a city of the first class, with a bicameral form of government.

Section 117 of the Virginia Constitution of 1902 was amended in November 1912 so as to provide: "* * * * the General Assembly may by general or special act (passed as prescribed by article four of the Constitution) depart in any respect (except as otherwise in this section expressly provided) from the form of organization and government prescribed by this article for cities and towns and may provide from time to time for the various cities and towns of the Commonwealth such

form, or forms, of municipal government as the General Assembly may deem best; but no such form or forms of government authorized by the second paragraph of this section shall become operative except as to such cities or towns as may thereafter adopt the same by a majority vote of its qualified electors at an election to be held as may be prescribed therefor by law."

The legislatures of 1914 and 1916, in pursuance of the authority granted by this amendment, gave the cities and towns the right to adopt any one of three forms of government: (1) The general councilmanic plan, as carried into the present Code under section 2936; (2) the modified commission plan as carried into the Code under section 2938; and (3) the city manager plan, as carried into the Code under section 2942.

The city of Charlottesville decided to adopt the modified commission plan, complied with section 2930 of the Code, and held an election on December 7, 1920, at which the qualified electors voted in favor of the modified commission plan of government, providing for five commissioners. This election was regular, legal and valid. In the ordinary course, at the next regular election of the council in June, 1922, the commissioners would have been elected, taking office September, 1922.

The charter of the city was amended and re-enacted by an act approved March 16, 1920 (Acts 1920, chapter 208), and again amended and re-enacted by an act approved February 28, 1922 (Acts 1922, chapter 109); one of the principal objects of the latter act being to validate the proceedings which had been had under the former act.

Section 117 of the Constitution was again amended at the election held in November, 1920 (see Acts 1920, chapter 350), so as to make subsection C provide:

"That the General Assembly, *at the request of any*

*city or town made in a manner provided by law,* may grant to it any special form of organization and government authorized by subsection B of this section, and subject to all the provisions of that subsection, except that it shall not be necessary for such city or town to thereafter adopt the same." (Italics supplied).

On March 24, 1922 (Acts 1922, chapter 411), the charter of the city, as theretofore granted, was amended and re-enacted so as to provide for a council 'of three members to be elected at large from the qualified voters of the city, to hold office for two years, the election to be held in June, 1922, and the councilmen to take office in September, 1922, and immediately elect a city manager.

The legislature has failed to pass an act prescribing the *manner in which a city or town shall make a request of the legislature* that it be granted a special form of government under subsection C of section 117 of the Constitution.

The city of Charlottesville has a commission form of government organized in accordance with the act of March 24, 1922. Its functions are vested in a council of three, elected from the people at large. The executive authority, in the management of the ministerial affairs of the city, is in a city manager elected by the council.

The contention of relator is that the act of March 24, 1922, is unconstitutional, because:

(1) The words in subsection C, "at the request of any city or town made in a manner provided by law," made it necessary as a condition precedent that the legislature first provide a method by which the request should be made;

(2) At the time of the enactment of the statute of March 24, 1922, the legislature had not provided as a

condition precedent a method by which the request could be made; and (3) section 117 of the Constitution cannot be construed retroactively, and thereby give a city the right to take advantage of the commission form of government provided for in section 2938 of the Code.

[1] The legislature of the State possesses all legislative power not prohibited in express terms or by necessary implication by the State Constitution or the Constitution of the United States.

[2] In doubtful cases, the limitation, by a State Constitution, of the power of the legislature is to be strictly construed, and the courts should resolve all doubts in favor of the constitutionality of the act. Every possible presumption is in favor of the validity of the act until overcome beyond all reasonable doubt. *Brown* v. *Epps*, 91 Va. 726, 21 S. E. 119, 27 L. R. A. 676; *Button* v. *State Corporation Commission*, 105 Va. 636, 54 S. E. 769; *Roanoke* v. *Elliott*, 123 Va. 393, 96 S. E. 819; *Commonwealth* v. *Staunton T. Co.*, 134 Va. 291, 114 S. E. 600.

[3] The authority to organize a commission form of government was given by the people at the election held December 7, 1920. The act of March 24, 1922, does not *provide* a commission form of government, but recites in terms, in the preamble, that the qualified voters of the city, by said election, adopted a "modified commission form" of government, and amends and modifies to a slight extent the form of government so adopted by the people. Section 48 of this act further recognizes the effect of the election of December 7, 1920, thus:

"It appearing that an emergency exists by reason of the fact that the election for councilmen must be held in the city of Charlottesville in June, nineteen hundred and twenty-two    *    *    ."

And in section 49 of the act of March 24, 1922, it is provided that such "repeal  *  *  *  shall not affect any right, act or transaction legalized or validated by section 48 of an act of the General Assembly of Virginia, approved on the 28th day of February, 1922, amending and re-enacting the charter of the city of Charlottesville."

While no specific reference is made in the act of February 28, 1922, to the election of December 7, 1920, ample reference is made to the purpose and effect of the act, the same being to cure any possible defects in the preceding charter of March 16, 1920, and to validate all proceedings had thereunder, which included the election of December, 1920, adopting a commission form of government to be organized in September following the next regular election of councilmen.

The preamble of the act of February 28, 1922, recites:

"Whereas there is a question as to whether or not chapter two hundred and eight of the acts of the General Assembly of Virginia, A. D. nineteen hundred and twenty, entitled," etc., "is a valid enactment of the General Assembly of Virginia by reason of the fact that there were only sixty-six votes in the affirmative when said act was put upon its final passage in the House of Delegates, section 117 of the Constitution of Virginia requiring a two-thirds vote of members elected to each house, and

"Whereas said act was accepted by the city of Charlottesville to be its charter and its public officials, officers, agents and employees have, under and by virtue thereof, done many acts within the apparent scope of their authority, agency and employment, the validity of which may hereafter be questioned, section 1, be it enacted," etc.

Section 48 of the act of February 28, 1922, provides as follows:

"This act, upon approval of the Governor, is hereby declared to be effective as of March sixteenth, nineteen hundred and twenty and retroactive as of the date of the passage hereof, and the General Assembly of Virginia hereby validates, legalizes and confirms all acts done by the city of Charlottesville and by the public officials, officers, agents and employees of the city of Charlottesville, within the apparent scope of their authority, agency and employment under chapter two hundred and eight of the acts of General Assembly of Virginia, of nineteen hundred and twenty, entitled an act to amend and re-enact an act of the General Assembly of Virginia approved March third, nineteen hundred, and in force from its passage, entitled an act to provide a new charter for the city of Charlottesville, and to repeal all acts inconsistent therewith; and also to amend and re-enact an act entitled an act to provide a new charter for the city of Charlottesville, approved March fourteenth, nineteen hundred and eight."

[4, 5] While subsection C of section 117 of the Constitution contemplates and requires some kind of request, the form of that request is left to the discretion of the legislature. Whether it shall be by the council, or by mass meeting or other particular mode, which the legislature might think satisfactory, the Constitution does not say. The amendment contains nothing which is intended to inhibit or limit the discretion of the legislature. The form of government of cities and towns is placed by the Constitution in the discretion of the legislature. We may just as safely trust that discretion with respect to the *form of the request* as with respect to the *form of government.*

The request recited in the preamble to the act of

March 24, 1922, is a request of "the voters in mass meeting assembled in response to a call issued by the Chamber of Commerce of said city and concurred in by the Rotary Club and the Young Men's Business Club of said city."

Counsel for relator concedes that a finding of this character by the legislature is conclusive. At page 10 of the record he says: "Suppose the General Assembly had enacted a law providing that cities could obtain a legislative charter from the General Assembly upon the request of a mass meeting of the citizens of the city, and suppose the act giving the charter recited that such meeting had been held. In such case, the court should not inquire whether the meeting had been held or not."

But he insists that the recital of the request in the whereas clause is not "providing by law" how a request must be made and that the law as to how the request must be made must precede the charter, and that the request must be made in pursuance of the law after its enactment. Counsel concedes that the power to grant this form of government on the request named in the preamble is in legislature, but contends it must be exercised by two acts and not by one. In the last analysis his objection to the constitutionality of the act of March 24, 1922, rests upon the failure to observe a very technical procedure.

[6] Constitutional provisions are directory and not mandatory where they refer to matters merely procedural, or confer discretion on the legislature. While the clause of the Constitution under consideration contemplates that the legislature shall enact a law in advance, prescribing how the request is to be made, its failure to do so does not invalidate an act granting a charter, where the form of the request therein stated is approved by the legislature.

[7] While the courts can pass upon the constitutionality of legislative enactments, they cannot overthrow legislative determination of the existence of conditions with respect to its own procedure, or the existence of conditions satisfying it of the propriety of its action.

In *Roanoke* v. *Elliott*, 123 Va. 393, 400, 96 S. E. 819, 822, it was contended that an emergency enactment must set out the facts constituting the emergency. But the court held that the finding of an emergency was conclusive, saying: "* * * It is necessary to state in the body of the bill that an emergency exists, in order that it may be put into immediate effect, for so the Constitution declares, but counsel very properly admit that 'the legislature is the sole judge of what shall constitute an emergency which will justify putting an act into immediate effect,' and the authorities so hold. See cases cited in 36 Cyc. 1193, 1194. It is for the legislature to 'ascertain and declare the fact of the existence of the emergency, and their determination is not reviewable eleswhere. The Constitution has vested the law making department of the government with power to determine that question * * * and such determination is not made reviewable by the courts.' "

In *Speer* v. *Athens*, 85 Ga. 49, 11 S. E. 802, 9 L. R. A. 402, the question was the validity of a private act because notice required by the Constitution had not been given. The court said: "It is proposed in this case to show by extrinsic evidence that the proper notice had not been given for a sufficient length of time before the bill was introduced into the legislature. We do not think the courts are authorized to receive such evidence and upon it to decide whether or not the legislature, a co-ordinate branch of government, has made an erroneous decision and allowed a bill to be introduced without the notice required by the Constitution and the law."

In *Cox* v. *Pitt County*, 146 N. C. 584, 60 S. E. 516, 16 L. R. A. (N. S.) 253, 254, the court held: "It is insisted, first, that the bond act is unconstitutional and void for the reason that said act is a private act and that thirty days' notice was not given as required in section 12, article 2 of the Constitution. It is immaterial whether the act be a public local law as defined in *State* v. *Chambers*, 93 N. C. 601, and similar cases, or purely a private act, as contended by plaintiffs. The courts will not go behind the ratification of the act to ascertain whether notice has been given in accordance with section 12, of article 2, of the Constitution of the State. While that section is binding upon the conscience of the General Assembly, and doubtless is intended to be observed by that body, the courts will not undertake to review the action in that respect of a coordinate department of the State government, and will conclusively presume from ratification that the notice has been given."

In *Agner's Case*, 103 Va. 811, 814, 48 S. E. 493, 494, it was contended that Buena Vista was not a city but a town because it had less than 5,000 inhabitants, but the court held otherwise, saying: "Where the legislature of the State has granted a city charter to a community, it must be assumed that its discretion in that regard has been properly exercised. 'If evidence was required, it must be supposed that it was before the legislature when the act was passed, and if any special finding were required to warrant the passage of the particular act, it would seem that the passage of the act itself might be held equivalent to such finding.' Cooley's Const. Lim. (7th ed.), pp. 257, 258. The foregoing proposition is too generally recognized and established to render it necessary to multiply authorities in support of it."

If the charter is defective, has the relator made out a proper case for judicial intervention?

[8] The writ of *quo warranto* does not issue as a matter of course, however fundamental may be the irregularities in the organization of a municipal government. The court, in determining the question, will consider the public interest involved and the extent of the injury complained of, and where little practical benefit would result to the relator and injury and inconvenience would result to the public, will deny the writ.

In *Watkins* v. *Venable*, 99 Va. 440, 443, 39 S. E. 147, 148, we find this:   "Neither at common law, under the modern practice, nor under the provisions of our statute in a case like this, is an applicant for the writ entitled, as a matter of absolute right, to have it issued, but whether it shall be awarded or not is subject, in a considerable degree, to the exercise of a wise judicial discretion.   Smart on Mandamus and Quo Warranto, etc. (Am. Ed. 1888), pp. 121–3; High's Extra. Leg. Rem., secs. 605, 628; Code, ch. 145, sec. 3024.   In the exercise of this discretion, upon the application of a private relator, says Mr. High, 'it is proper for the court to take into consideration the necessity and policy of allowing the proceeding as well as the position and motives of the relator in proposing it, since this extraordinary remedy will not be allowed, merely to gratify a relator who has no interest in the subject of inquiry.   The court will also weigh the considerations of public convenience involved, and will compare them with the injury complained of in determining whether to grant or refuse the application.   And whenever it is apparent that the filing of the application would result in no practical benefit, as where there is no one claiming the office in opposition to the respondent, and the term will expire before a trial of the right can be had, or where a new election for the office is about to occur, which will afford full redress to the relators, the court may properly refuse the application for leave to file the information.' "

The case of *Attorney-General* v. *Methuen*, 236 Mass. 564, 129 N. E. 662, was an information in the nature of a writ of *quo warranto* instituted by the Attorney-General of Massachusetts to have declared void a charter granted to Methuen because it had not been properly accepted by the people. The court decided the charter was unconstitutional, but the writ was denied on the ground that the public good would not be subserved, but jeopardized to no good purpose. The court said: "There is, however, another principle to be considered in this conclusion. The granting of relief by *quo warranto*, even when sought at the instance of the Attorney-General in behalf of the public, is not a matter of absolute right, but is a subject for the exercise of sound judicial discretion. It is the duty of the court to consider all the conditions, including immediate and remote consequences, and to determine with a broad vision of the public weal whether on the whole the common interests demand the issuance of this extraordinary remedy. Where the legality of the organization of a municipality is concerned, then even the Attorney-General in his public capacity cannot, as of right, demand the issuance of *quo warranto*. His application must be considered in all its bearings as related to the general welfare. One of the grounds on which *quo warranto* was denied in *Commonwealth* v. *Athearn*, 3 Mass. 285, 287, was said by Chief Justice Parsons, at page 287, to be that 'In the present case it would not be a discreet and proper exercise of their authority.'

"Lord Mansfield, in *King* v. *Stacy*, 1 Term. Rep. 1, at 2, stated the law thus: 'The courts are bound to consider all the circumstances of the case before they disturb the peace and quiet of any' municipal corporation.

"Where important public interests have become af-

fected and there has been considerable delay, sound judicial discretion may require denial of affirmative action and refusal to oust a municipality from the exercise of its franchise. This proposition is supported by the great weight of authority and no decision to the contrary has come to our attention.  *  *  *  The relief sought is to have a judgment of ouster against a municipality from exercising the functions of a city because a statute, which has received the affirmative action of the legislative department of the government and the approving signature of the Governor, is contrary to the fundamental law. The establishment of a city in place of a town form of government is the exercise of a legislative function of a high order. It involves immediate and important public interests. A city charter cannot in the nature of things be enacted except after a generous degree of publicity. This charter was approved by the Governor on April 17, 1917. A period of nearly nine months elapsed before a city government was inaugurated upon its supposed authority. During that period of course the validity of the charter might have been tested in appropriate proceedings. See *Graham* v. *Roberts*, 200 Mass. 152, 85 N. E. 1009. The inauguration and maintenance of a city government is full of publicity. Methuen has been recognized as a city by the general court in special statutes enacted subsequent to Sp. St. 1917, c. 289. See St. 1919, c. 340; St. 1920, c. 83; Special Acts 1918, cc. 36, 184. See Special Acts 1919, c. 215. State taxes have been assessed upon Methuen as a city, the collection of which must have been made through the instrumentality of those purporting under Sp. St. 1917, c. 289, to be officers of the city. St. 1918, c. 279; St. 1919, cc. 344, 346; St. 1920, cc. 557, 612. The same is true of county taxes. St. 1917, c. 343. The population of the town

of Methuen, according to the State census of 1914, was slightly in excess of 14,000.  It is manifest that, in so large a community, considerable sums of money must have been raised by taxation and expended for public uses.  All the manifold activities of a municipality have been carried on for about two years and a half under the supposed authority of Sp. St. 1917, c. 289, as a valid city charter before the filing of this information.  Many contracts must have been made in reliance upon its assumed force.  It must be presumed that the public schools have been kept, teachers employed, police and fire protection afforded, highways constructed and maintained, the poor relieved, and other necessary attributes of the government of a city performed.

"*   *   *   All these considerations lead to the conclusion that it would not be in conformity to the general public interest to grant the relief prayed for."

In a similar case the Supreme Court of Colorado, in *People* v. *Keeling*, 4 Colo. 129, 132, said:  "The consideration that a successful prosecution of this proceeding would result in the suspension of all municipal government in the city largely controlled the discretion of the court in refusing the writ in the case first cited. The same. consideration, we think, obtains in the case at bar.  The ouster of these respondents would not result in reinstating the former mayor and aldermen.

"It is not claimed that the respondents were not regularly and peaceably inducted into office upon the certificates of election issued by the clerk under the provisions of the statute.  No municipal officers were elected upon the day fixed by law, nor are the outgoing mayor and aldermen here, or elsewhere, so far as it appears, contesting the title of the respondents; nor does it appear but what they voluntarily surrendered their respective offices to the respondents at the time of their induction into office.  This is a fair presump-

tion, and in the absence of averments·to the contrary, this court cannot safely act upon any other.

"The result of the proceeding, so far as we can determine from the information, would be to leave the city of Pueblo without a municipal government for the coming year. The former mayor and aldermen having voluntarily surrendered their offices, cannot at will resume them, or rehabilitate themselves with powers and duties which they have in effect resigned. The provision of the law, that they shall hold their offices until their successors are elected and qualified is without force to avoid the consequences of their voluntary surrender."

To the same effect, see *Morris* v. *Fagan*, 85 N. J. Law, 617, 90 Atl. 267; and *State* v. *Mead*, 56 Vt. 353.

[9] The interests of the relator are slight and any other form of government would probably levy the same taxation and impose the same restrictions upon it as those of which it complains. The interest of the public is great. The present government has taken office and performed all the functions of government. It has installed police, levied taxes, issued bonds, let contracts for public improvements, etc. The granting and successful prosecution of the writ would result in the suspension of all municipal government.

[10] We are of opinion that the act of March 24, 1922, is constitutional; that the sufficiency of the occasion for that act has been determined by the legislature, whose determination is beyond the control of the court; that the issuance of the writ would jeopardize the public interest and violate a sound public policy, without furthering the interests of relator, and that the present government of the city of Charlottesville is legal and valid.

The judgment of the corporation court dismissing the petition will be affirmed.

*Affirmed.*