# Staunton.

## CHALMERS AND ALS. v. FUNK & SON.

### October 9, 1882.

1. STATUTES—*Construction.*—In the interpretation of statutes, as of deeds, the primary object is to ascertain the intention of the lawmakers, and to give that intention effect, although the construction may not be in conformity with the letter of the law. The whole statute must be taken together and the different provisions reconciled, so as to make the entire act consistent and harmonious.

2. IDEM—*Idem—Case here.*—Under an act approved 14th February, 1882, entitled "An act authorizing the voters of Roanoke county to vote upon the question of granting license for the sale of liquors therein, or in any magisterial district thereof," an election was held on 13th April, 1882, at which 491 votes were cast, whereof 101 were *for*, and 339 were *against* granting license in the county. A majority of the votes cast in each magisterial district were also against the granting of the licenses. The number of registered voters in the county exceeded two thousand. F & Son applied to the county court of said county for license to sell liquors therein. Of said act § 4 declares: "If it appear from the abstracts and returns of any such election that in the said county a majority of the *registered votes* have been cast against license for the sale of intoxicating liquors, then no license shall be granted to any person for the sale of such liquors." And § 5 declares: "But if it appears from the abstracts and returns of any such election, that in the said county *a majority of votes have been cast* in favor of license, and that a majority of votes have been cast in any district or districts of said county, then no license for such sale in any of the districts so voting shall be granted." When the act passed the house of delegates, the word "registered" was not in it. When it went to the senate, it was there amended by the insertion of the word "registered," before the word "votes," in the second line of § 4; and so amended, it passed the house and became a law. The county court denied the license on the ground that by the result of the said election it was forbidden to grant it. On appeal, the circuit court granted the license, and to its judgment the appellants sought a writ of *supersedeas*.

HELD :

    1. *Supersedeas* denied.

    2. Applying the rules of construction without doing violence to the language used, or resorting to any strange interpretation, but looking to all the parts of the act and to the history of its passage, it is plain that the intent of the legislature was to require a majority of the *registered voters* of the county, instead of a majority of the *votes cast*, to be given against license in order to inhibit the granting of license to sell liquor in the said county, or in any magisterial district thereof.

Error and *supersedeas* to judgment of circuit court of Roanoke county, construing the act of assembly approved February 14, 1882, Sessions Acts 1881–2, pp. 120–121, and granting license to Funk & Son, applied for by James Chalmers, James S. Yeatman and other citizens. It was agreed by the parties that the decision of this court on the application should stand for its final decision. It was argued at Wytheville and decided at Staunton.

The opinion states the case.

*Taylor & Phlegar* and *G. W. & L. C. Hansbrough,* for applicants.

*Johnson & Logan,* for Funk & Son.

. STAPLES, J., delivered the opinion of the court.

At the last session of the legislature an act was passed to take the sense of the voters of Roanoke county " upon the question of granting license for the sale of liquors therein, or in any magisterial district thereof."

An election was accordingly held on the 13th of April, 1882, at which four hundred and ninety-one votes were cast, of which one hundred and one were for, and three hundred and thirty-nine were against granting license in the county. A majority of the votes cast in each magiste-

rial district were also against the granting of the licenses. It further appears that the number of registered voters in the county exceeds two thousand.

The point arising in this case is, whether, under the act just referred to, a majority of the registered voters is necessary to prevent the granting of license, or whether a majority of the votes actually cast is sufficient.

The act in question, after prescribing the mode and manner of conducting the election, proceeds, in the 4th section, as follows: "If it appear from the abstracts and returns of any such election, that in the said county a majority of the registered votes have been cast against license for the sale of intoxicating liquors, then no license shall be granted to any person for the sale of such liquors." The question is as to the true meaning and interpretation of the words "registered votes," used in this section. Counsel have argued that these words do not mean the same thing as the words "registered voters." That they tend rather to express the idea of votes listed, entered, or recorded on the poll-book, or that a vote may be registered when the judges of election have filled and signed the proper certificate.

The argument of the learned counsel is more ingenious than sound. The word "registered," in its popular acceptation, has several definitions, according to the connection in which it is employed. When used in our statutes, relating to elections, it has a well-defined, well-understood signification. When these statutes speak of registered voters, they uniformly refer to the persons whose names are placed upon the registration books provided by law as the sole record or memorial of the duly qualified voters of the State. It must be obvious that a mere change of phraseology in a statute from the words "registered voters" to the words "registered votes," does not indicate a difference of legislative intent. It is believed that no statute can be found, general or special, in which the word "registered"

has been used in any other sense, or for any other purpose, than that now suggested.

When, therefore, the legislature requires that a majority of the registered votes shall be given in order to the accomplishment of a particular end, it does not mean simply a majority of the votes entered on the poll-books, but a majority of those whose names are registered as voters in the proper registration books kept for that purpose. That this is the proper construction and meaning of the act in this case is shown by the history of the act itself. As the bill originally passed the house of delegates, the word registered was omitted. When, however, it reached the senate, ineffectual efforts were made to defeat it; several amendments were offered and rejected. Finally, a motion was made by the senator from Halifax to amend the bill by inserting after the words "majority of," in the second line of the 4th section, the words "the registered," so as to read, "a majority of the registered votes," and this amendment was adopted by the senate, and the bill, as thus amended, passed both houses of the legislature. That the object of this amendment was to require a majority of the registered voters of the county, instead of a mere majority of the votes cast, is too clear for argument. This object would have been effected more accurately perhaps by an entire change of the phraseology of the section. But the legislative intent is manifest, and the terms used are sufficiently plain to express it. Although the act makes no provision for it, there is no difficulty in ascertaining the number of registered voters in the county. The registration books are always accessible, and were in fact used without objection on the hearing in the court below. The act itself contemplates the use of these books in order to determine the result of the election.

If there be any real difficulty in this case, it grows out of the fifth section of the act, which is as follows: "But if it

appear from the abstracts and returns of any such election that in the said county a majority of the votes have been cast in favor of license, and that a majority of votes have been cast against license in any districts or district of said county, then no license for such sale in any of the districts so voting shall be granted."

It will be seen that the word "registered" is not used in the fifth section, so that under it a majority of the votes cast may defeat the license in each magisterial district, although under the fourth section a majority of the registered votes is necessary to that result in the county. It is easy to perceive how this incongruity originated. As has been seen, the bill as originally framed required only a majority of the votes cast to defeat the liquor traffic in the county. When the amendment was proposed in the senate, it is very probable the fifth section was overlooked. All persons, both enemies and friends of the bill, no doubt supposing that the object contemplated would be accomplished by the amendment inserted in the fourth section. Had the bill, with the proposed amendment, been referred to the proper committee in either house, as it ought to have been, this difficulty would never have occurred. It is but an instance, frequently happening, of the carelessness of modern legislators, perplexing alike to the courts and the people.

Notwithstanding the omission of the word "registered" in the fifth section, I think it ought to be read as though it had been actually inserted therein. No one can read the act in all its parts, and along with the history of its passage, without a strong conviction that the legislature did not intend that the general laws governing the sale of intoxicating liquors should cease to operate in Roanoke county, except upon the declared will of the majority of the legally qualified voters of the county.

In the interpretation of statutes, as of deeds, the primary

object is to ascertain the intention of the lawmakers, and to give that intention effect, although the construction may not be in conformity with the letter of the law.

For, as has been well said, a thing which is within the intention of the makers is as much within the statute as if it were within the letter, and a thing which is within the letter is not within the statute unless it be within the intention of the makers. " The only rule," says Chief-Justice Tyndale, "for the construction of acts of parliament is that they should be construed according to the intent of the parliament which passed the act." Sedgwick on Statutory and Com. Law, p. 194.

And when a doubt arises, although apparently the doubt attaches only to a particular clause, the whole statute is to be taken together, and to be examined, to arrive at the legislative intent. Page 199. Effect is to be given, if possible, to every clause and section of it, and it is the duty of the court, as far as possible, to reconcile the different provisions so as to make the whole act consistent and harmonious. Page 201.

A very striking illustration of this rule is found in Matthews' case, 18 Gratt. 989, 993. In that case it was held that no person could be tried for a felony in Virginia except upon an indictment of a grand jury, notwithstanding a statute providing it might be done " upon the certificate of a committing justice." This court, after a careful investigation into the history of the statute as it passed the legislature, became satisfied that the words authorizing a trial upon the certificate of the " committing magistrate " were by mistake inserted at the end of the section instead of the beginning, and the court did not hesitate so to construe them and thus give effect to the legislative rule.

Applying these rules and principles, we have no difficulty in this case in ascertaining the intention of the legislature

and in giving effect to that intention, without doing violence to the language used or resorting to any strange construction.

My opinion, therefore, is, that there is no error in the judgment of the circuit court, and that the writ of error should be refused.

WRIT OF ERROR REFUSED.