## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

### HARRISON AND OTHERS V. BARKSDALE.

March 30, 1920.

1. MANDAMUS—*Jurisdiction of Supreme Court of Appeals.*—The jurisdiction which the Supreme Court of Appeals exercises, under the statute in such case made and provided, in the matter of mandamus, is co-extensive with that exercised at common law by the Court of King's Bench in England.

2. MANDAMUS—*Jurisdiction—Special Election on Adoption of City Manager Plan—Order of Court Proclaiming Result.*—Under Acts 1918, pp. 403, 404, it is provided that when an election is held to determine whether a, city shall adopt the city manager plan of government, the judge of the circuit court having jurisdiction over the municipality shall enter an order declaring the result of the election.

   *Held:* That the duty of the judge to enter such order is a public ministerial duty enforceable by mandamus.

3. MANDAMUS—*Private Individual.*—Mandamus will lie, at the suit of a private individual, although the latter is without any special or pecuniary interest which is affected, to enforce a public ministerial duty imposed on the respondent by statute.

4. MANDAMUS—*Wrongful Exercise of Power—Mandamus to Compel Rightful Exercise.*—The mere fact that an act has been done, if it be a purely ministerial act, has no effect upon the remedy of mandamus, if that act be not the one which it was the duty of the respondent to perform. Whatsoever ministerial action the respondent may take which is contrary to statutory authority which imposes upon him the duty in question is null and void; is as if it had never been taken; and the action which his statutory duty imposes upon him remains still unperformed. It is true that mandamus will not lie unless the respondent is in possession of the authority to perform the act sought at the time the writ is asked to be issued; but the mere fact that he has done something contrary to his duty does not of itself deprive the respondent of the authority later to reverse such actions and perform his duty aright. The lack of such authority, if there be such lack, must be due to some other cause.

5. MANDAMUS—*Wrongful Exercise of Power—Mandamus to Compel Rightful Exercise—Order Announcing Result of Election on City Manager Plan.*—The mere fact that under Acts 1914, p. 165, as amended by Acts 1916, p. 672, and Acts 1918, pp. 403, 404, providing for the adoption of the city manager plan of government by a municipality, the judge of the circuit court having jurisdiction of the municipality has entered an order wrongfully declaring the result of an election upon the adoption of the city manager plan of government, will not prevent the issuance of mandamus to compel the judge to enter an order declaring the right result.

6. MANDAMUS—*Order of Court—Order a Ministerial One.*—In proceedings by mandamus to compel the judge of the circuit court to declare the result of an election on change of government to the city manager plan, the mere circumstance that the action of respondent which is in question was in the form of an order of court does not affect the authority of respondent to subsequently enter a contrary order, because the order which had been entered was not a judicial order, but purely a ministerial declaration put in that form as directed by the statute.

7. MANDAMUS—*Special Election on City Manager Plan—Evidence to Determine Number of Voters—Moot Cases.*—On the question of fact of what was the number of electors of a city qualified to vote at a special election on a proposed change in the form of the city government, evidence consisting of the certificates and affidavits of registrars and the certificate of the clerk of the corporation court of the city, tending to show the number of electors registered and otherwise qualified to vote at such election, was admissible. Such evidence was material in order to make the record present the questions involved for adjudication, in a proceeding by mandamus to compel the judge of the circuit court to enter an order declaring the rightful result of the election, since courts will not adjudicate moot cases.

8. MUNICIPAL CORPORATIONS—*City Manager Plan—"Majority of its Qualified Electors."*—Under the Constitution of 1902, sec. 117, as amended in 1912, which provides that a change by a city to the city manager plan of government shall be "by a majority vote of its qualified electors at an election," etc., a majority of the qualified electors of a municipality actually voting in favor of the change of the form of municipal government, at a special election held as prescribed by law at which that is the only proposition voted upon, is sufficient to adopt the changed form of government, though in point of fact it was not a majority of all of the electors who were qualified and entitled to vote at such election, but a minority of such electors.

9.  ELECTIONS—*"A Majority of the Voters."*—Unless a contrary intention is clearly expressed in the Constitution or statute in question, the actual meaning of such phrases as "a majority of the voters," or "a majority of the legal voters," or "a majority of the qualified voters," and of similar phrases is that a majority, or other proportion stipulated, of those of the class mentioned actually voting at the election at which the proposition to be determined is voted on, or the officer to be chosen is voted for, is sufficient to satisfy the requirement as to the vote contained in such phrases.

10. MUNICIPAL CORPORATIONS—*City Manager Plan—"Majority Vote of Its Qualified Electors."*—Acts 1914, p. 165, as amended by Acts 1916, p. 672, and Acts 1918, p. 402, enacted in pursuance of section 117 of the Constitution as amended in 1912, do not provide any machinery for ascertaining and certifying to the court the definite number of qualified electors entitled to vote at the election; so that the ascertainment of that fact definitely must depend upon evidence *aliunde;* therefore, it presents a case of an indefinite number of electors, as that term is used in the rule that in elections where there is an indefinite number of voters, the general rule, where not otherwise provided, is that those absenting themselves and those who being present abstain from voting are considered as acquiescing in the result declared by a majority of those actually voting, though in point of fact only a minority of those entitled to vote really do vote.

11. MUNICIPAL CORPORATIONS—*Elections—Majority.*—If the constitutional or statutory intent on the subject of majority, or other proportionate vote stipulated, is not "clearly expressed" so as to require to the contrary, the language will be construed to refer to the vote of the class mentioned which is in fact cast at the election; that is to say, if the language of the Constitution or statute on the subject leaves its meaning in doubt, it will be so construed.

12. MUNICIPAL CORPORATIONS — *Elections — City Manager Plan— Majority Required.*—The words "voting thereon," as used in sections 196 and 197 of the Constitution of 1902, serve no other function than to expressly state a meaning which would be implied from the preceding language, even if it had not been so expressly stated, certainly in cases involving a special election at which only a single proposition is voted upon; and therefore the absence of the words "voting thereon" from section 117 of the Constitution as amended in 1912, does not require that section to be construed as requiring a majority of the qualified electors whether voting or not.

13. STATUTES—*Constitutional Law—Construction—Aid from Other Statutes or Constitutions.*—Little or no aid in ascertaining the constitutional or statutory meaning of an ordinance or enactment on a subject can be derived from the mere fact that other independent (not amendatory) statutory expressions of meaning on the same subject are not uniform; and especially is this true where the latter expression is at a different time and by a different body of men, and in connection with another and different object.

14. STATUTES—*Constitutional Law—Construction—Aid from Other Statutes or Constitutions—City Manager Plan.*—Sections 944a, cl. 39, of the Code of 1904, and 1038e, cl. 7, under the rule of the preceding syllabus, are of no weight as indicating that the omission of the phrase "voting thereon," or some like phrase, from section 117 of the Constitution as amended in 1912, requires section 117 to be construed as requiring a majority of the qualified electors whether voting or not.

15. MUNICIPAL CORPORATIONS — *Elections — City Manager Plan— Majority of Electors.*—The majority required in an election held on the city manager plan of government for a city was expressed in Acts 1914, p. 165, and Acts 1916, p. 672, by the phrases "a majority of the qualified voters authorized to vote" and "a majority of the electors qualified to vote," whereas in the same statute as amended in 1918 (Acts 1918, p. 402), the expression "a majority vote of the qualified electors" is used, which is practically the precise language of section 117 of the Constitution as amended in 1912.

   *Held:* That these variations in expression were but different forms used by the different legislative bodies for the purpose of expressing but one and the same, and not a different meaning.

16. CONSTITUTIONAL LAW—*Legislative Construction.*—While a legislative construction of a constitutional provision is entitled to great consideration and respect, it is not controlling upon the courts. The judicial department of the government is especially charged with the responsibility of construing constitutional provisions.

Original application for mandamus.

*Mandamus denied.*

This is a proceeding instituted by the petition of Randolph Harrison and others, citizens, taxpayers and qualified

voters of the city of Lynchburg, praying of this court a writ of mandamus to compel the respondent, the Hon. Wm. R. Barksdale, to enter an order precisely contrary in its purport to the order which was in fact heretofore entered by him in the case.

The case involves a special election held in the city of Lynchburg on November 4, 1919, under the statute (Acts 1914, p. 165, as amended by Acts 1916, p. 672, and Acts 1918, p. 402.), which was enacted in pursuance of section 117 of the Constitution as amended in 1912, providing among other things for a change in the previously existing form of government of cities and towns to the plan known as the "City Manager Plan."

The Constitution, as amended as aforesaid, in so far as material to be stated here, provides that the changed form of government aforesaid shall not become operative except as to such cities or towns as may thereafter adopt the same "by a majority vote of its qualified electors at an election to be held as may be prescribed therefor by law."

The statute aforesaid, in so far as material to be here stated, provides that special elections for the purpose aforesaid may be ordered by the circuit court having jurisdiction over the municipality "upon the petition of electors equal in number to at least ten per cent. of those qualified to vote at the last preceding general election at which a mayor or council was elected," and provides also that such special elections shall be conducted in the manner prescribed by law for the conduct of regular elections and by the regular election officers of the municipality, for secret ballot, and for the form of the ballot, after which the statute continues as follows: "Returns of the election shall be certified by the commissioners of the election, or their clerk, to the court, or to the judge thereof in vacation; and if it shall appear that the proposed change has not been adopted by a majority vote of the qualified electors, an order shall

be entered of record accordingly; * * but if the said pro-posed change is adopted by a majority vote of the qualified electors, the court or judge thereof shall enter an order ac-cordingly, a copy of which shall be forthwith certified by the clerk of such court to the council of such city or town for recordation upon its journal." Acts 1918, pp. 403, 404.

From the proceeding in which the special election afore-said was ordered, it appears from evidence consisting of certificates of registrars and of the clerk of the corpora-tion court of said city and the affidavit of one Peter O. Adams, that those qualified to vote at the last preceding general election aforesaid theretofore held were in number, so far as disclosed by the evidence adduced 3,191, but at most could not have exceeded 4,000; that more than ten per cent of that number, namely 600, had petitioned for the election; and that the election was accordingly ordered by said court.

It appears from the returns of the special election, held as aforesaid on November 4, 1919, certified by the commis-sioners of election, that the total number of votes cast was 1208, of which 774 were *for* and 434 *against* the proposed change in the municipal government.

No question is raised in the case on the subject of whether those who cast the said 1208 votes were all quali-fied electors of the city of Lynchburg, and that they were such electors seems to be a *concessum* in the case.

Accompanying the petition for mandamus is evidence, consisting of the certificates and affidavits of registrars and the certificate of the clerk of the corporation court of the said city, tending to show that the electors of the city reg-istered and otherwise qualified to vote at said special elec-tion on November 4, 1919, were in number approximately 3981, and were at least as many as 3191, the number, as disclosed by the evidence adduced, who were qualified to vote at the preceding general election theretofore held as aforesaid.

24

The petitioners appeared before the respondent, by his permission, as *amici curiae,* prior to his action on the election returns and certificate of the commissioners of election aforesaid, and presented to him the same evidence mentioned in the paragraph next above, and urged upon him the position which is the same as that taken in the petition for mandamus, that it appeared that the proposed change in the city's form of government had not been adopted by a majority vote of the electors as required by the provisions on that subject of the Constitution and statute law aforesaid, and that therefore it was the duty of respondent under the statute to enter an order of record accordingly. Respondent, however, took a different view of the matter, declined to consider the evidence presented to him as aforesaid or any other extraneous fact or facts outside of the certificate of the commissioners of election aforesaid, and, in vacation, entered the following order:

"The commissioners of election for the city of Lynchburg having certified to the court the returns on the election held in the city of Lynchburg on the 4th day of November, 1919, heretofore ordered on the proposed change in form of municipal government from the existing form to that known as the "City Manager Plan," as defined and prescribed by Acts of Assembly of 1916 and 1918, and it appearing from said returns that 774 votes were cast in favor of the change in the form of municipal government and that 434 votes were cast against the change in the form of municipal government, and the court having heard argument by Leon Goodman for the petitioners, and Volney E. Howard, A. R. Long, Don P. Halsey and Randolph Harrison, *amici curiae,* as to the meaning of the words, "majority vote of the qualified electors," as used in the Constitution, section 117, and Acts of the General Assembly, 1918, page 402, counsel for petitioners contending that a majority of the electors voting was sufficient under the law to cause a change

in the form of present municipal government of Lynchburg, and counsel acting as *amici curiae* contending that no such change in the present form of municipal government had been adopted by reason of the fact that a majority of all the qualified electors had not voted in favor of said change; and the court having fully considered the arguments is of opinion that said votes so cast in favor of the change in the form of municipal government constitute in contemplation of law a majority of the qualified electors of said city, the court doth order that said change in the form of municipal government is adopted by a majority vote of the qualified electors of the said city of Lynchburg.

"The clerk of this court is hereby directed to forthwith certify a copy of this order to the council of the city of Lynchburg for recordation upon its journal, as required by law.

"The clerk of this court is directed to enter this order upon the records of this court, and the same is certified to him for entry as a vacation order."

*Harrison & Long, Don P. Halsey* and *Volney E. Howard,* for petitioners.

*Harper & Goodman,* for respondent.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

The questions presented by the record for decision will be disposed of in their order as stated below.

We are confronted at the outset with a question of procedure, namely:

[1-3]  1. If the position of the petitioners were well taken, and it was the duty of the respondent to have entered a contrary order from that which he did enter, would mandamus lie to compel him to do so?

This question must be answered in the affirmative.

In view of the full discussion of this subject in the opinion of this court delivered by Judge Burks in the case of the *City of Roanoke* v. *Elliott,* 123 Va. 393, 96 S. E. 819, we here refer thereto, and will add to that opinion at this point only such additional matter as seems appropriate in view of the positions taken and the authorities cited for respondent in the case in judgment.

The jurisdiction which this court exercises, under the statute in such case made and provided in the matter of mandamus, is co-extensive with that exercised at common law by the Court of King's Bench in England. *Clay* v. *Ballard,* 87 Va. 787, 789, 13 S. E. 262. The duty of respondent in question, if it exists, is a public duty; and since the case of *Rex* v. *Railroad Company,* 2 Barn. & Ald. 646, it has been uniformly held that mandamus will lie, at the suit of a private individual, although the latter is without any special or pecuniary interest which is affected, to enforce a public ministerial duty imposed on the respondent by statute. *Union Pacific R. Co.* v. *Hall,* 91 U. S. 343, 23 L. Ed. 428, 432.

The same principle has been applied in West Virginia in the holding that mandamus will lie at the suit of a citizen, voter and taxpayer to compel the council of a town and the county court of a county to perform a ministerial duty imposed by statute of causing an election to be held. *State* v. *Town of Davis,* 76 W. Va. 587, 85 S. E. 779, 780; *Frantz* v. *Wyoming County,* 69 W. Va. 734, 73 S. E. 328; and other West Virginia cases therein cited.

[4, 5] In opposition to the conclusion which we have above reached on the question under consideration, it is urged in argument before us, however, that the office of a mandamus is to compel the performance of some act which has not been performed, and that it does not lie to compel a respondent to undo what he has already done; that in

the latter case the respondent has become *functus officio*, with no further power in the premises; that for mandamus to lie the respondent must be in possession of the power to perform the act sought at the time the writ is asked to be issued; and the following authorities are cited to sustain such positions, namely: *Thurston* v. *Hudgins*, 93 Va. 780, 20 S. E. 966; *White's Creek Turnpike* v. *Marshall*, 2 Baxt. (Tenn.) 104; *Sweet* v. *Conley*, 20 R. I. 381, 39 Atl. 326; *Maxwell* v. *Burton*, 2 Utah 595; *State* v. *Miller*, 1 Lea (Tenn.) 596, and *Tennant* v. *Crocker*, 85 Mich. 328, 48 N. W. 577.

Now the mere fact that an act has been done, if it be a purely ministerial act, has no effect upon the remedy of mandamus, if that act be not the one which it was the duty of the respondent to perform. Whatsoever ministerial action the respondent may take which is contrary to statutory authority which imposes upon him the duty in question, is null and void; is as if it had never been taken; and the action which his statutory duty imposes upon him remains still unperformed. It is true that mandamus will not lie unless the respondent is in possession of the authority to perform the act sought at the time the writ is asked to be issued; but the mere fact that he has done something contrary to his duty does not of itself deprive the respondent of the authority later to reverse such action and perform his duty aright. The lack of such authority, if there be such lack, must be due to some other cause. And upon examination of the authorities last mentioned we find nothing therein in conflict with these views, but much to sustain them.

In *Thurston* v. *Hudgins, supra,* 93 Va. 780, 20 S. E. 966, the act which had been done was that of an officer in the exercise of quasi judicial duties, requiring the exercise of judgment and discretion. It was for that reason there held that mandamus would not lie to undo the action, and not

merely because the action was a past event.. The same is
true of the powers of the commissioners in the case of
*White's Creek Turnpike* v. *Marshall, supra,* 2 Baxt. (Tenn.)
104, the exercise of which the court said would not be con-
trolled by mandamus.

In *State* v. *Miller, supra,* 1 Lea (Tenn.) 596, a commit-
ting magistrate, on a preliminary examination being waived
by the accused, did not examine the witnesses for the State
and reduce their testimony to writing as the statute di-
rected, but sent the accused on to the circuit court for in-
dictment and trial. While the accused was still in custody
of the circuit court, mandamus was sought to compel the
magistrate to perform the duty aforesaid. The court held
that the case had passed from the jurisdiction of the mag-
istrate; that he had then no power to order the accused
out of the jurisdiction of the circuit court and bring him
back before the magistrate for examination, and that be-
cause of these reasons the respondent magistrate lacked the
authority, at the time the writ was sought, to perform the
duty in question, if it ever existed. On the latter point,
indeed, the majority of the court held that such duty never
in truth existed, as the preliminary examination was waived
by the accused.

In *Sweet* v. *Conley, supra,* 20 R. I. 381, 39 Atl. 326, the
respondent was a mere surveyor (overseer) of the high-
way, who acted, in changing a grade of a street, under a
void order of the municipal council, and hence it was held
that the respondent had no authority at any time to act in
the premises, either to do or to undo what he did. The
opinion of the court in that case does say that it has been
frequently held that the form of action by mandamus will
not lie to undo what ought not to have been done, citing
*White's Creek Turnpike* v. *Marshall, supra,* 2 Baxt. (Tenn.)
121, and *Ex parte Nash,* 15 Q. B. 92. We have seen above
that what was sought to be undone in the former case was

the action of commissioners performing *quasi* judicial func-
tions involving the exercise of judgment and discretion. In
the latter case, the situation was peculiar. The mandamus
did not seek to compel the performance of any duty, but
solely to undo an act done without authority of statute, as
the petitioners claimed. They did not seek to compel the
respondent to discharge any duty which he had not dis-
charged. As said by Lord Campbell, C. J., with respect to
the writ of mandamus: "We grant it when that has not
been done which a statute orders to be done; but not for
the purpose of undoing what has been done. We may, upon
an application for a mandamus, entertain the question
whether a corporation not having affixed its seal, be bound
to do so; but not the question whether when they have af-
fixed it, they have been right in so doing."

In *Maxwell* v. *Burton, supra,* 2 Utah 595, there was a
statute which directed the respondent, a registrar, to do
preicsely what he did, and the court merely held that it
could not enter upon a consideration of the validity of such
statute in a mandamus proceeding (of which the appellate
court in that State, as set forth in the opinion, had no orig-
inal jurisdiction); the only jurisdiction of the court being
on appeal.

In *Tennant* v. *Crocker, supra,* 85 Mich. 328, 48 N. W. 577,
the mandamus was denied, not because the act in question
had been done, but on the ground that the court in the mat-
ter of granting or refusing a writ of mandamus exercised
a certain discretionary power (but see *Clay* v. *Ballard,
supra,* 87 Va. at p. 790, 13 S. E. 262), and that the action
there involved (which was that of a mayor in declaring
that a resolution was adopted), being on its face illegal
and void, so that no valid contract of the municipality could
be entered into under it, and hence so that no injury to the
municipality could arise, the mandamus should be (as it
was) refused. The court, however, in that case, expressly

held that it had the power to issue the mandamus. In this connection the court said: "The decision of the mayor in the case under consideration did not involve the exercise of discretion, but was ministerial, as a presiding officer of the council. If the resolution did not have the requisite two-thirds vote to support it, it was his duty to declare it lost. Jurisdiction is given by the Constitution to this court to issue the writ of mandamus, and it is within the province of the court to restrain public bodies and officers of the municipal divisions of the State from exceeding their jurisdiction, and to require them to perform such specific duties as the law imposes upon them" (citing cases).

[6] In the case in judgment, the mere circumstance that the action of respondent which is in question was in the form of an order of court does not affect the authority of respondent to subsequently enter a contrary order, because the order which has been entered was not a judicial order, but purely a ministerial declaration put in that form as directed by the statute. *Roanoke* v. *Elliott, supra,* 123 Va. 393, 96 S. E. 819.

[7] 2. On the question of fact of what was the number of electors of the city of Lynchburg qualified to vote at the special election on the proposition of the proposed change in form of the city government, we are of opinion that, so far as material, the evidence, tending to show what was the number of such electors, which accompanies the petition in the case in judgment, is admissible and should be considered by us. It is the same character of evidence as that on which the court below in the proceeding in which it ordered the special election, ascertained what was at most the number of electors of such city qualified to vote at the next preceding election designated in the statute, and since courts will not adjudicate moot cases, such evidence is material in order to make the record present the questions involved for adjudication.

, We come now to the consideration of the case on its merits, upon which the question presented for our determination is the following:

[8]   3. Under the provision of the Constitution, drawn in question, is a majority of the qualified electors of a municipality actually voting in favor of the change of the form of municipal government, at a special election held as prescribed by law at which that is the only proposition voted upon, sufficient to adopt the changed form of government, though in point of fact it was not a majority of all of the electors who were qualified and entitled to vote at such election, but a minority of such electors?

This question must be answered in the affirmative.

The specific language of the Constitution which provides by what vote the change in form of municipal government must be adopted before it can go into effect, requires a municipality to adopt the changed form of government "by a majority vote of its qualified electors at an election," etc.

We assume, in accordance with what seems to be a *concessum* in the case, that the votes cast at the special election drawn in question, were cast by qualified electors of the city. The evidence, aforesaid, satisfactorily shows that those voting in the affirmative were not a majority of the qualified electors entitled to vote, but were a majority of such electors who actually voted at such election.

In Dillon on Mun. Corp. (5th ed.), sec. 383, p. 663, concerning the legislative or constitutional meaning of the language, "a majority of the voters," or "a majority of the legal voters." or "a majority of the qualified voters," and of similar phrases, in a Constitution or statute prescribing the vote required for election to office or for any other municipal purpose, it is said: "The *natural meaning* of these phrases, when not qualified, is a majority of all those within the electorate who are entitled to participate in the election." (Italics supplied). But, as the same author says.

in substance, in construing such a constitutional or statutory provision, what the courts must ascertain is not the abstract *natural* meaning of such phrases *per se*, but the actual constitutional or statutory meaning with which such phrases are used in such a provision. And, as laid down by the same learned work just cited, the latter meaning must be ascertained by reference "to the principles and practical working of representative government." *Idem,* sec. 383, p. 663.

And, as stated in the same work, sec. 383, pp. 653-4: "In elections where there is an indefinite number of voters, the general rule, where not otherwise provided, is that *those absenting themselves* and those who being present *abstain from voting are considered* as acquiescing in the result declared by a majority of those actually voting, though in point of fact only a minority of those entitled to vote really do vote, and the majority of those voting constitutes merely a majority of a minority. This principle is inherent in representative government and is necessary to the practical working of the elective system." Citing the leading English case of *Oldknow* v. *Wainwright,* 2 Burr. 1017, 1021, in which Lord Mansfield delivered the opinion of the court, and supreme court and other cases. As said of a contrary construction in *Taylor* v. *Taylor,* 10 Minn. 107 (Gil. 81), (where the language under consideration was "a majority of the electors of the county") : "This construction is perhaps in accordance with the letter of the Constitution, but it leads to such practical inconvenience, hardship and absurdity, we cannot believe it to be in accordance with the spirit and meaning of that instrument."

[9] Accordingly, we find, from the time of the holding of Lord Mansfield in *Oldknow* v. *Wainwright* down to the present, that it is held by the great weight of authority that, unless a contrary intention is clearly expressed in the Constitution or statute in question, the actual meaning of such

phrases as aforesaid, is that a majority, or other proportion stipulated, of those of the class mentioned actually voting at the election at which the proposition to be determined is voted on, or the officer to be chosen is voted for, is sufficient to satisfy the requirement as to the vote contained in such phrases. 1 Dillon on Mun. Corp. (5th ed.), sec. 383, pp. 654-5 and note 2, citing the following cases, which involve, respectively, the phraseology which is quoted after each case cited, namely: *St. Joseph Township* v. *Rogers,* 16 Wall. (U. S.) 644, 21 L. Ed. 328, ("majority of the legal voters of a township"); *Carroll County* v. *Smith,* 111 U. S. 556, 4 Sup. Ct. 539, 28 L. Ed. 517 ("two-thirds of the qualified voters of such county at a special election or regular election to be held therein"); *Knox County* v. *Ninth Nat. Bank,* 147 U. S. 91, 99, 13 Sup. Ct. 267, 270, 37 L. Ed. 93 ("two-thirds of the qualified voters of such county at a regular or special election to be held therein"); *Mobile Sav. Bank* v. *Oktibbeha County* (D. C.), 22 Fed. 580 ("two-thirds of the qualified voters of such county at a special election or regular election to be held therein"); *Pacific Imp. Co.* v. *Clarksdale,* 74 Fed. 528, 532, 20 C. C. A. 635 ("two-thirds of the qualified voters"); *Vance* v. *Austell,* 45 Ark. 400 ("consent of a majority of the qualified voters of the county"); *State* v. *Sumpter County Commissioners,* 19 Fla. 518, 539 ("majority of the number of registered votes"); *Pickett* v. *Russell,* 42 Fla. 116, 139, 28 So. 764, 771 ("majority of the qualified electors" of a school district "that pay a tax on real or personal property"); *Green* v. *State Board of Canvassers,* 5 Idaho 130, 138, 142, 47 Pac. 259, 261, 262, 95 Am. St. Rep. 169 ("majority of the electors"); *People* v. *Garner,* 47 Ill. 246, ("majority of the voters of such county at any general election"); *Melvin* v. *Lisenby,* 72 Ill. 63, 67, 22 Am. Rep. 141 ("majority of the legal voters living in the county"); *Kuns* v. *Robertson,* 154 Ill. 394, 412, 40 N. E. 343, 348

("two-thirds of the whole society") ; *Citizens and Taxpayers* v. *Williams*, 49 La. Ann. 422, 440, 21 So. 647, 654, 37 L. R. A. 761 ("majority of the property taxpayers in number and value") ; *Foy* v. *Gardiner Water Dist.*, 98 Me., 82, 85, 56 Atl. 201, 202 ("majority vote of the legal voters within said district") ; *Walker* v. *Oswald*, 68 Md. 146, 155,. 11 Atl. 711, 714 ("majority of the voters of said county") ; *Murdock* v. *Strange*, 99 Md. 89, 57 Atl. 628, 3 Ann. Cas. 66; *Shearer* v. *Bay County Supervisors*, 128 Mich. 552, 556, 87 N. W. 789 ("majority vote of the electors of said county") ; *Rike* v. *Floyd*, 6 Ohio Cir. Ct. 80, 125; *Schlichter* v. *Keiter*, 156 Pa. 119, 27 Atl. 45, 22 L. R. A. 161 ("two-thirds of the whole society"). To the same effect see 10 Am. & Eng. Ency. L. (2nd ed.), p. 754; 15 Cyc. 388; Note in 12 Am. & Eng. Anno. Cas. 415; McCreary on Elections (4th ed.), sec. 208; *Richardson* v. *McReynolds*, 114 Mo. 641, 21 S. W. 901 ("two-thirds of the legal voters of said district").

[10] In the case in judgment there was "an indefinite number of voters" in the sense in which that phrase is used in the quotation above made from Dillon on Mun. Corp., p. 653; that is to say, the provisions of the Constitution involved and of the statute putting the Constitution into effect do not provide any machinery for ascertaining and certifying to the court the definite number of qualified electors entitled to vote at the election; so that the ascertainment of that fact definitely must depend upon evidence *aliunde*. Statutes exist in this State which prescribe the various essential things which go to make a citizen a qualified elector entitled to vote at such an election as that in question, such as the requisite age, residence, registration, exemption from or pre-payment of poll taxes, with entry of name on the treasurer's list where the exemption does not exist. If correct when originally made, such records, however, may be rendered inaccurate by subsequent deaths, convictions of crime or removals of former electors. There

is no statutory requirement in cases of deaths or convictions of crime assuring an accurate continuous record thereof which would be available in making up the election returns. It is notorious that the statutory requirements as to maintaining a record on the registration books of removals are seldom accurately complied with. And where the statute, as in the case in judgment, does not fix upon the machinery by which all these various matters are to be evidenced, the accuracy of the registration books and the treasurer's lists is open to question by the extraneous evidence, and is left at large and undetermined. There is no way of making such evidence complete short of gathering affirmative evidence of the age, residence, time of residence of every person whose name is on the registration books and also on the treasurer's list and on the list of those exempt from the requisite of the prepayment of poll taxes, the identity of the persons so named, also affirmative evidence sufficient to prove that no person who is registered and fails to vote has been omitted from the list of those exempt from the prerequisite of payment of poll taxes; also affirmative evidence sufficient to prove that none, or, if any, which, of the persons ascertained to have been in all other respects qualified electors, subsequently and before the election died, or was convicted of such crime, or had removed, so as to disqualify him from voting at the election in question, and evidence of other details which we need not here mention. This would be a difficult and burdensome task to impose as a ministerial duty upon any one. And often the vote may be so close that absolute accuracy is essential to determine the result of the election. Of course, in some cases the vote one way or the other may be so large that there would be little practical difficulty in ascertaining the correct result. It would be only in such cases that the elective method under consideration would be free of the practical difficulties and burdensomeness of administration aforesaid.

In the case of the ordering of the election, the statute avoids the detailed investigation aforesaid by providing that the petitioners shall equal in number *"at least"* the percentage designated of the total electorate at the time of the next preceding general election mentioned, so that the judge ordering the election need only require that the number of petitioners be sufficiently large to render all existing uncertainty aforesaid as to the exact total of the electorate immaterial. Hence the situation *at an election* is practically very different from that existing at the mere ordering of an election.

The difference in the situation at the mere ordering of the election from that existing at the election itself, as requiring the detailed *aliunde* investigation aforesaid, is well illustrated by what occurred in the case in judgment in the proceeding in which the election was ordered, as set forth in the statement preceding this opinion. There the number of petitioners for the election was so large that it appeared that the statutory and constitutional requirement on the subject had been complied with, even if the total electorate had been as large as 6,000; whereas there was sufficient evidence adduced, without going into matters of detail, to satisfactorily establish the fact that after allowing for all existing uncertainty affecting the total of the electorate, due to death, convictions of crime, removals, etc., such total could have been at most not in excess of 4,000, and the percentage of petitioners of even that extreme number exceeded the statutory requirement fifty per cent. Thus, any need of the detailed investigation aforesaid was obviated. And a court or judge in vacation, on application for the ordering of such an election, under the peculiar language of the statute on that subject aforesaid, may properly require so large a number of petitioners that he will be relieved from entering upon the detailed investigation aforesaid, before he enters the order. But he has no such con-

trol of the situation which develops "at an election." In
the latter case, the count of the number of the votes cast
may inescapably impose the duty of detailed investigation
aforesaid, if the Constitution or statute requires a majority
vote of the total electorate in order to adopt the proposi-
tion being voted upon.

Now it is true that notwithstanding the aforesaid diffi-
culties growing out of the failure to provide practical ma-
chinery to ascertain the definite number of qualified voters
at an election if the constitutional or statutory provision
plainly requires such ascertainment, the burden would be
upon the administrative officer charged with the duty of
declaring the result, to undertake to ascertain such result
by such means as may be available; but in cases where the
majority vote in the affirmative or negative is not suffi-
ciently large to overcome any existing uncertainty afore-
said as to the total of the electorate, the task would be at-
tended with the burden and practical difficulties aforesaid.
Hence many of the cases hold that if the Constitution or
statute, which, of course, is designed to be operative in
elections which have a close vote as well as in all others,
intended to prescribe such an elective method, it would
provide in itself a machinery for the ascertainment of the
total electorate and give to such machinery the effect of
definite evidence on the subject.

[11] Accordingly, we find that the conclusion aforesaid
of the great weight of authority on the subject rests upon
the principle that if the constitutional or statutory intent
on the subject of majority, or other proportionate vote stip-
ulated, is not "clearly expressed" so as to require to the
contrary, the language will be construed to refer to the
vote of the class mentioned which is in fact cast at the elec-
tion.   That is to say, if the language of the Constitution
or statute on the subject leaves its meaning in doubt, it
will be construed as last stated.   See, in addition to above

cited authorities, *Cass County* v. *Johnston,* 95 U. S. 360, 24 L. Ed. 416.

We are of opinion that the language of the Virginia Constitution aforesaid which we have under construction is substantially the same as that involved in the authorities above cited; and especially is this true of the language involved in the *Carroll County Case,* 111 U. S. 556, 4 Sup. Ct. 539, 28 L. Ed. 517, being "of the qualified voters of said county;" in the *Richardson* v. *McReynolds Case,* 114 Mo. 641, 21 S. W. 901, being "of the legal voters of said district;" in *Shearer* v. *Bay County Supervisors,* 128 Mich. 552, 556, 87 N. W. 789, 790, being "majority vote of the electors of said county;" and in *Pickett* v. *Russell,* 42 Fla. 116, 128, 28 So. 764, 768, being "a majority of the qualified electors" (of a school district) "that pay a tax on real or personal property." There may, under certain circumstances, be a difference between the meaning of "voters" and "electors," but we perceive no difference between the meaning of "qualified voters" and "legal voters," of a county or municipality, and "electors" or "qualified electors," of a county or municipality.

Only the cases of *Chalmers* v. *Funk,* 76 Va. 717, 719, 720; *Green* v. *Village of Rienzi,* 87 Miss. 463, 40 So. 17, 112 Am. St. Rep. 449; *Duke* v. *Brown, Collector,* 96 N. C. 127, 1 S. E. 873; *Rigsbee* v. *Town of Durham,* 98 N. C. 81, 3 S. E. 749; *Wood* v. *Commissioners,* 97 N. C. 227, 2 S. E. 653, and *State* v. *Brooks,* 17 Wyo. 344, 99 Pac. 874, 22 L. R. A. (N. S.) 478, are cited in argument before us as authorities containing a holding contrary to the conclusion we have above reached on the question under consideration.

In *Chalmers* v. *Funk,* 76 Va. 717, 719-720, the statute involved authorized Roanoke county to vote upon the question of granting license for the sale of liquors therein or in any magisterial district thereof. An election was held at which 491 votes were cast, of which 101 were *for* and

339 against granting license in the county. A majority of the votes cast in each magisterial district was also against the granting of the licenses. The number of registered voters in the county exceeded 2,000. Section 4 of the statute (Acts 1881-82, pp. 120, 121) provides as follows: "If it appear from the abstracts and returns of any such election that in the said county a majority of the registered votes have been cast against license for the sale of intoxicating liquors, then no license shall be granted to any person for the sale of such liquors."

The opinion of the court delivered by Judge Staples says: "* * The word 'registered' in its popular acceptation, has several definitions, according to the connection in which it is employed. When used in our statutes, relating to elections, it has a well-defined, well-understood significacation. When these statutes speak of registered voters, they uniformly refer to the persons whose names are placed upon the registration books provided by law as the sole record or memorial of the duly qualified voters of the State. It must be obvious that the mere change of phraseology in a statute from the words 'registered voters' to the words 'registered votes' does not indicate a difference of legislative intent. It is believed that no statute can be found, general or special, in which the word 'registered' has been used in any other sense, or for any other purpose than that now suggested.

"When, therefore, the legislature requires that a majority of the registered votes shall be given in order to the accomplishment of a particular end, it does not mean simply a majority of the votes entered on the poll-books, but a majority of those whose names are registered as voters in the proper registration books kept for that purpose. That this is the proper construction and meaning of the act in this case is shown by the history of the act itself. As the bill originally passed the House of Delegates, the

26

word registered was omitted. When, however, it reached the Senate ineffectual efforts were made to defeat it; several amendments were offered and rejected. Finally a motion was made by the senator from Halifax to amend the bill by inserting after the words 'majority of' in the second line of the 4th section, the words 'the registered,' so as to read 'a majority of the registered votes,' and this amendment was adopted by the Senate, and the bill as thus amended passed both houses of the legislature. That the object of this amendment was to require a majority of the registered voters of the county, instead of a mere majority of the votes cast, is too clear for argument. This object would have been effected more accurately perhaps by an entire change of the phraseology of the section. But the legislative intent is manifest, and the terms used are sufficiently plain to express it. Although the act makes no provision for it, there is no difficulty in ascertaining the number of registered voters in the county. The registration books are always accessible and were in fact used without objection on the hearing in the court below. The act itself contemplates the use of these books in order to determine the result of the election."

No allusion is made in the opinion just quoted to the long line of decisions from which the great weight of authority holding as above adverted to is disclosed. Many of these decisions had been then made, and plainly the opinion was not intended to contain a holding at variance to such authority without reference to a single one of them. And it is manifest from the opinion that its holding is for the most part based on the peculiar fact appearing in evidence in the case touching the amendment of the bill while the statute was in process of enactment, inserting the word "registered." Hence we do not consider the case last cited as in conflict with the conclusion aforesaid which has been reached by us.

The case of *Green* v. *Village of Rienzi,* 87 Miss. 463, 40 So. 17, 112 Am. St. Rep. 449, 451, so far as it approaches the question under consideration decides merely that the word "elector" when used in a statute relating to the issuance of bonds by a municipality and providing that they shall not issue unless authorized by a majority of the "electors," means not only voters who have registered but those who have both registered and have the other qualifications entitling them to vote. Hence the case is not in point.

Of the three North Carolina cases last above mentioned we need say only this: As appears from 10 Am. & Eng. Ency'l Law, p. 574, that State is among the few States which have taken a contrary view to that of the weight of authority aforesaid.

The case of *State* v. *Brooks,* 17 Wyo. 344, 99 Pac. 874, 22 L. R. A. (N. S.) 478, involves the following constitutional provision, namely: "Any amendment or amendments to this Constitution may be proposed," etc., "and it shall be the duty of the legislature to submit such amendment or amendments to the electors of the State at the next general election * * and if a majority of the electors shall ratify the same, such amendment or amendments shall become a part of this Constitution." It is not held in such case, however, that such provision requires for the adoption of the constitutional amendment voted upon a majority vote of all of the electors entitled to vote thereon! But merely that the election being a general election such provision requires for the adoption of the amendment voted upon a majority of the electors actually voting at the general election on all questions voted upon, and not simply a majority of the electors actually voting on the proposed amendment, as by the weight of authority would have been the case had the election been a special election at which one proposition only was voted upon.

Such holding is in accord with many other cases (Dillon on Mun. Corp., sec. 383, pp. 657-663; 10 Am. & Eng. Ency'l Law, p. 754), and is not at all in conflict with the conclusion we have reached above, since the case in judgment involves a special election at which only the one proposition was voted upon.  Many of the authorities, however, hold that even at a general election such language in the Constitution or statute as that involved in the case last considered requires only a majority vote on the particular proposition in order that it may be adopted.  And the latter is stated by the learned author of Dillon on Mun. Corp. as being in his opinion, the correct view.  1 Dillon on Mun. Corp., *supra* (p. 663).

[12]    It is urged in argument before us that in sec. 196 of the Virginia Constitution providing for ratification of any proposed amendment thereof and permitting it to be done by a majority vote of those actually voting at the election, the phrase "voting thereon" is added to the provision requiring the amendment to be approved and ratified by "a majority vote of the electors qualified to vote for members of the General Assembly;" and that in section 197 of the same Constitution, providing for the calling of a convention, to revise the Constitution, which permits that to be done by a majority vote of those actually voting on the proposition, the same phrase "voting thereon" is added to the provision requiring for the adoption of such a proposition a vote for the convention of "a majority of the electors so qualified;" and that if the meaning of section 117 of the Constitution had been intended to be as we have construed it above, the phrase "voting thereon" would have been inserted therein.  But we think the added phrase "voting thereon" as used in sections 196 and 197 of the Constitution serve no other function than to expressly state a meaning which under the weight of authority aforesaid would be implied from the preceding language, even if it

had not been so expressly stated; certainly in cases involving a special election at which only a single proposition is voted upon. And at most, even in cases involving a general election, such added phrases would serve no other function than to make the meaning plain, which otherwise might have been left in doubt, that the majority vote of the electors required is only of those voting on the particular proposition, and not of all of those voting at the general election on that and other propositions. See 1 Dillon on Mun. Corp., sec. 383, p. 662.

[13] Further: As said in *State* v. *Blaisdell*, 18 N. D. 41, .119 N. W. 360, 365: "It is also urged that the fact that in different sections of the Constitution, relating to different subjects which are to be submitted to a vote, the language is not uniform, and in some of them it is specified explicitly that the vote referred to is the vote cast upon the question in hand. * * * It is well known that in the constitutional convention various committees were appointed, each having jurisdiction over a subject differing from those being considered by the other committees. They did not act in concert on questions of this character. One might copy a provision from the Constitution of one State, and another from some other State. This undoubtedly accounts for the varying phraseology of the different provisions for submitting questions to a vote and necessitates considering each one independently of the others." These considerations apply with yet greater force where, as in the case in judgment, the language of the amendment to the Constitution involved is that of a legislative body, distinct from that of the convention which framed the language of the other sections of the Constitution with which comparison is sought to be made. Little or no aid in ascertaining the constitutional or statutory meaning of an ordinance or enactment on a subject can be derived from the mere fact that other independent (not amendatory) stat-

utory expressions of meaning on the same subject are not uniform; and especially is this true where the latter expression is at a different time and by a different body of men, and in connection with another and different object.

[14]   What is said in the two paragraphs next above also applies *mutatis mutandis,* to the phrase "voting upon the question" contained in the statute (section 944a, clause 39, of Pollard's Code) authorizing the issue of county bonds—"if it shall appear * * that three-fifths of the qualified voters of the county voting upon the question are in favor of issuing bonds," etc.; and of the phrase "ballots cast upon this question," in sec. 1038e, clause 7 of the Code, allowing towns to issue bonds—"if a majority of the ballots cast upon the question so submitted .be in favor of such bond issue"—which are other instances urged in argument before us as indicating that the omission of the phrase "voting thereon," or of some like express phrase, from section 117 of the Constitution as amended, evidences that the language therein used should receive a contrary construction from that which we have given to it.

[15]   The following is also urged upon our consideration, namely: The aforesaid statute providing for the submission of such a proposed change in form of municipal government as aforesaid to a vote of the municipal electorate as first enacted in 1914 (Acts 1914, p. 165), and as again enacted in 1916 (Acts 1916, p. 672), contained the provisions, "and if it shall appear that *a majority of the qualified voters authorized to vote* at such election shall not vote for such proposed change, an order shall be entered of record accordingly; * * * but if *a majority of the electors qualified to vote* at such election, shall vote in favor of such proposed change in the form of government, the court or judge thereof shall enter an order accordingly, * * ." (Italics supplied.)   Whereas the same statute as amended in 1918 (Acts 1918, p. 402), in both of such provisions as

to the order to be entered in case of a negative, as well as of an affirmative vote, contains the language, "a majority vote of the qualified electors," which is practically the pre-·cise language of section 117 of the Constitution as amended in 1912, instead of the language which we have italicised ·in the quotations next above. Of these variations in expression we deem it sufficient to say that we are of opinion that it appears from the face of the statutes themselves that these are but different forms used by different legislative bodies for the purpose of expressing but·one and the same and not a different meaning.

[16]   The further circumstance is also·urged that the legislature at the same session of 1918 at which it amended the said statute of 1914 passed a joint resolution (Acts 1918, p. 784), for the submission to a vote of the people of an amendment to said section 117 of the Constitution so as to make that part of it above quoted, which concerns the adoption of the changed form of government aforesaid, require that the same shall be adopted by "a majority vote of those qualified voters of any such city or town voting in an election," etc. It is contended that this action evidences that the Legislature of 1918 construed section 117 of the Constitution as. amended in 1912 to have a meaning contrary to what we have held above to be its true meaning. While such construction from such a source would be entitled to great consideration and respect, we cannot consider. it as controlling upon us. The judicial department of the government is especially charged with responsibility of construing the constitutional provision in question, and, because of the principle .and the considerations above adverted to, and of the great weight of authority on the subject aforesaid, we are constrained to take the view we have above expressed.

In conclusion we feel that we should say that we are confirmed in the opinion that the view we have taken of the

subject in hand is correct, because the fact stands out, as a result of the able and exhaustive argument of eminent counsel in the case, that throughout the Constitution and statute law of this State, in its provisions for the election of all officers, for bond issues, for changes of any and all provisions of the Constitution, including those of at least as much importance as a change in municipal form of government here and there in the State, and even for the calling of a constitutional convention which may change the form of government of the very State itself, so long as such change does not violate what would now seem to be the somewhat elastic guarantee of a republican form of government which is contained in our Federal Constitution, that in this State the principle and the considerations of practical convenience aforesaid are allowed to control, with the result that subjects of the most momentous importance are submitted to a decision of the majority, or other stipulated proportion of the qualified electors or voters of the electorate who may vote at the election, although they may in fact constitute but a small minority of those entitled to vote at the election; and this is done uniformly on all subjects, unless indeed the subject of a change in a municipal form of government under section 117 of the Constitution as amended in 1912 furnishes an exception to such policy of the State. For the reasons which we have outlined above, and which need not be repeated here, we find nothing in the language of that section as it stands, or in the history of the legislation putting that constitutional provision into effect, to satisfy us that such constitutional provision was intended to furnish such an exception.

The writ of mandamus will therefore be denied.

*Mandamus denied.*